456 So.2d 714 (1984)
James Vincent MOFFETT
v.
STATE of Mississippi.
No. 55052.
Supreme Court of Mississippi.
August 22, 1984.
*715 J.W. Miller, Biloxi, David Seth Michaels, New York City, for appellant.
Edwin Lloyd Pittman, Atty. Gen., William S. Boyd and Marvin L. White, Jr., Sp. Asst. Attys. Gen., Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
On the evening of December 27, 1980, a white, female, self-service gas station attendant was robbed, shot and killed while on the job in Gulfport, Mississippi. Two days later James Vincent Moffett was arrested on an unrelated charge, but in due course thereafter was indicted on the charge of capital murder arising out of this incident. Trial saw a Harrison County jury on July 15, 1981 find Moffett guilty of capital murder and sentence him to death. Moffett appeals his conviction and sentence.
The primary questions before us today arise out of the manner in which the trial judge allowed the State to handle its witness, Garland Mose Johnson, at trial. First, the trial judge erroneously allowed the State to cross-examine its own witness and subsequently to impeach him with an inconsistent, prior, unsworn, out-of-court statement. Second, the trial judge erroneously allowed the State to have the statement admitted as evidence, whereupon the prosecuting attorneys proceeded to argue to the jury that it should be used to find guilt. We reverse.

II.
On the evening of December 27, 1980, Helen Allen was working her job at the Coastal Energy Station in Gulfport. This establishment is self-service gas station comprised of gasoline pumps and a small booth for the cashier. Helen Allen was the cashier in the booth.
The evidence reflects that at approximately 10:00 p.m. that evening, someone came up to the booth where Helen Allen was working, fired one gunshot through the plexi-glass wall of the booth into the head of Helen Allen and thereby killed her.
Shortly thereafter, Barbara Tenneson, who lived in an apartment complex nearby, *716 came to the service station to buy a pack of cigarettes. She could not see the attendant. Along with an unidentified man who was waiting to buy gasoline, Mrs. Tenneson waited for the attendant to appear. In a little while, the would-be gas purchaser gave up and left. About the same time, Mrs. Tenneson's husband came to the service station and both of them looked around. When they could not find the attendant, Mr. Tenneson thought something must be wrong and the police were called. After about thirty minutes from when Mrs. Tenneson first came to the gasoline station, she and her husband discovered Helen Allen's body on the floor in the cashier's booth. Mrs. Tenneson testified that the cash register was wide open with no money in it.
Police officer Charles Rogers testified that he was not sure if the cash register had any money in it but that there was money on the counter  how much he did not know. Detective Ernest R. Cook of the Gulfport Police Department testified there were several stacks of currency on the counter and that the drawer of the cash register had money in it. There was no usable fingerprint evidence at the crime scene. There were no ballistics reports admitted as evidence in this case.

III.
The most damaging evidence adduced against Moffett at his trial came through the witness Garland Mose Johnson, said to be Moffett's half-brother. Without the introduction into evidence of the transcription of an interview with Johnson had by law enforcement authorities on March 2, 1981, the case against Moffett would have been weak to say the least. Hence the dispositive issues on this appeal surround the Johnson testimony.
Johnson was arrested on December 29, 1980, several hours before Moffett's arrest. Johnson's arrest was on charges unrelated to the capital murder with which we are here concerned. Johnson remained in custody in Harrison County continuously from December 29, 1980 until Moffett's trial in July of 1981.
On March 2, 1981 Johnson was interviewed by Detective Cook. Sitting in as a witness was Detective Parham Bridges. The interview was video taped.
The substance of the interview was Johnson's statement to the effect that at about 10:00 or 10:30 on the evening of December 27, 1980, he and Moffett drove to and parked in the area of an apartment complex known as Medallion Apartments. Moffett was driving the car. Johnson says Moffett left, although he (Johnson) did not know where Moffett was going. Johnson slid over into the driver's seat and turned the radio on low. Minutes later Johnson says he heard a gunshot. "All of a sudden I see him [Moffett] come running back to the car. So he jumps in and says ... let's go to north Gulfport."
Because the Medallion Apartments are located only a stone's throw from the self-service gas station and because Johnson's statement refers to the incident as having occurred shortly after ten o'clock on the evening of December 27, 1980, this statement substantially implicates Moffett in the robbery and murder. The State assumed that it had a reliable witness who would place Moffett at the scene of the crime at or about the time of the crime.
On June 30, 1981, Moffett's attorneys interviewed Johnson. At that time Johnson said that he knew nothing about the robbery or murder, that on the evening in question he had been with Moffett, and that neither he nor Moffett went any where near the Medallion Apartments or the self-service gas station. Johnson told Moffett's attorneys that he had given the police the statement of March 2, 1981, but that what he had said at that time was untrue.
On Friday, July 10, 1981, the attorneys for Moffett again interviewed Johnson. At this time Johnson was still in custody and had several charges pending against him unrelated to the capital murder with which we are here concerned. The record also reflects that there was at the time pending *717 against Johnson a charge of accessory after the fact to the capital murder of Helen Allen. At that time Johnson was represented by counsel, and the interview was conducted with the advice and consent of Johnson's counsel. The interview was tape recorded although not video taped.
In this July 10, 1981 interview, Johnson insisted again that he knew nothing of the December 27, 1980, shooting and corroborated Moffett's alibi as he had indicated he would do earlier. He again explained that he gave the March 2, 1981 statement without the advice of counsel and because he was scared. He says he was afraid he was going to be charged with the Allen murder and this is the reason he decided to point the finger at his half-brother, James Vincent Moffett.
The capital murder trial of James Vincent Moffett was scheduled to begin in Circuit Court in Gulfport on the morning of July 13, 1981. At approximately 9:00 that morning, defense attorneys advised the district attorney what Johnson's testimony would be. In anticipation of the State's calling Johnson as a part of its case in chief, the defense requested of the trial judge a preliminary ruling that the State be precluded from pleading surprise and, more specifically, that the State be precluded from treating Johnson as an adverse witness and thus subjecting him to leading questions on cross-examination. The trial judge held that the matter was premature until such time as Johnson actually took the stand.
The next day, July 14, 1981, Garland Mose Johnson was called by the State as its first witness following the noon lunch recess. The defense again sought a preliminary ruling regarding the manner in which these prosecuting attorneys could examine Johnson, and again the trial judge held that the matter was premature.
On direct examination, Johnson then testified under oath that on the evening of December 27, 1980 he was at the apartment of Kimberly Butler, that he received a call from Moffett at about 10:30 or so, that Moffett asked Johnson to come pick him up, that Johnson borrowed a car from a next-door neighbor and drove to Sally's Bar in north Gulfport to pick up Moffett, that Moffett made a phone call to his girl friend and later wife, and that Johnson then took Moffett home.
Once it became apparent that this was what  and all  Johnson was going to say happened on the evening of December 27, 1980, the prosecuting attorney began inquiring about the video-taped interview of March 2, 1981. Johnson admitted that he had made the March 2, 1981 statement, admitted that what he said at the time was quite different from his in-court, underoath testimony of July 14, 1981, and stated unequivocally that everything he had said on March 2, 1981 to law enforcement authorities was untrue.
At this point the prosecution pleaded surprise and sought the right to cross-examine Johnson. The defense objected, insisting that the State had called Johnson as its witness, that the State therefore vouched for his credibility, was precluded from asking him leading questions on cross-examination, and certainly could not impeach him. Defense counsel further insisted that the State was not in fact surprised, that the State knew as early as 9:00 on the preceding morning what Johnson's testimony would be, and that the State put Johnson on the witness stand knowing full well how he would testify.
An extensive in camera hearing followed, during the course of which the trial judge viewed in its entirety the video tape of the March 2, 1981 interview and listened to the audio tape of the July 10, 1981 interview. The trial judge ruled that the State was surprised and would be allowed to cross-examine and impeach the witness.
The prosecuting attorney then commenced a searing cross-examination of Johnson regarding the March 2, 1981 statement. Again, Johnson admitted that he made the statement, insisted that its contents were untrue, and reiterated that he made the statement because he was afraid that he would be charged with the murder. At no time did Johnson either deny having *718 made the March 2, 1981 statement or admit under oath that any of its contents were true.
At the conclusion of the cross-examination, the State offered into evidence a five-page typed, transcript of the March 2, 1981 interview. The defense objected, urging that the statement could be used only to impeach the witness' general credibility and not as substantive evidence. The prosecuting attorney seemed to concede the point stating:
Judge, for the purposes of, I'm not attempting to use this as substantive law [evidence (?)] because I think we've already made out a prima facie case with the testimony of Kimberly Butler. You know, I think I can, without his testimony, you know, in other words, without his testimony, I can get the jury.
The trial judge withheld the statement from the jury at that time. Subsequently, the statement was received into evidence and the State did in fact rely heavily on the statement as substantive evidence particularly in its final argument to the jury.

IV.
In this context, we are presented on this appeal with two distinct though interrelated questions:
(1) On these facts, was the State "surprised" so that it was entitled (a) to ask Johnson leading questions and (b) to impeach Johnson's credibility?
(2) Assuming arguendo an affirmative answer to these questions, was the State entitled to have received into evidence the unsworn, out-of-court statement made by Johnson four and one-half months prior to trial?

A.
At common law a party was prohibited from impeaching his own witness. This has been the general rule in Mississippi. Moore v. Chicago, St. Louis & New Orleans R.R. Co., 59 Miss. 243, 248 (1881); Bove v. State, 185 Miss. 547, 554, 188 So. 557, 558 (1938); Manning v. State, 188 Miss. 393, 398, 195 So. 319, 320 (1940). The party calling the witness is said to vouch for his credibility. The underlying premise is that, a trial being a search for the truth, a litigant has no business presenting a witness whose credibility is open to serious doubt.
We recognize today that the rule is not in favor. It has become riddled with exceptions. See, e.g., Hall v. State, 250 Miss. 253, 165 So.2d 345 (1964) ("The State is not bound by the testimony of a witness who unexpectedly proves hostile)." It has been abrogated altogether in civil cases. Rule 43(b)(4) Miss.R.Civ.P., effective January 1, 1982, provides that the "credibility of a witness may be attacked by any party, including the party calling him."
We are aware that there are pending before the Court at this time proposals that the rule be abrogated in all cases, not just civil. Those proposals are not made in this case. The State concedes that the rule still exists and remain enforceable in criminal cases, insisting only that this case falls within the well-recognized "surprise" exception. Indeed, if ever there be a case where the underlying premise of the rule is valid, it is when the State is selecting its witnesses in a capital murder trial.
All therefore agree that the State had no right to cross-examine Johnson and further to impeach Johnson on cross-examination, absent a showing that the State was genuinely surprised by Johnson's testimony and that he had become unexpectedly hostile. The foundation which the State was required to lay in this case has been described authoritatively in Hall v. State, 250 Miss. 253, 165 So.2d 345 (1964):
The party must first show that the evidence as given, has taken him by surprise and that the witness is hostile. The witness may then be asked if he has made contradictory statements out of court, the times, places and circumstances of the details being described to him in detail. Underhill's Criminal Evidence Vol. 1, 5th ed., p. 547.
250 Miss. at 264, 165 So.2d at 350.
On the other hand, where the witness' repudiation of his prior statement is well *719 known to the State's attorney prior to the time the witness is called to testify, there is in fact and in law no surprise  and hence the State's attorney cannot and may not claim surprise. Hall v. State, 250 Miss. 253, 263, 165 So.2d 345, 350 (1964); see Allison v. State, 447 So.2d 649, 650 (Miss. 1984) (state must establish that it was taken by surprise); Young v. State, 425 So.2d 1022, 1028 (Miss. 1983) ("evidence indicating surprise" necessary); Gardner v. State, 368 So.2d 245, 248 (Miss. 1979) ("unexpectedly hostile"); Hooks v. State, 197 So.2d 238, 239-40 (Miss. 1967) (must show that evidence has "taken him by surprise); Rutland v. State, 170 Miss. 650, 653-54, 155 So. 681, 681-82 (1934) (must be a situation where prosecutor was "deceived or mislead by fraud or artifice").
The facts of this case make it clear that the foundation requirements for coming within the exception to the general rule have not been laid. The prosecution called Johnson to the stand as its witness as a part of its case in chief. The prosecuting attorneys knew well when Johnson was placed on the stand what his testimony would be, and, more specifically, that his testimony would be unfavorable to the State. The prosecuting attorneys knew that Johnson would repudiate his March 2, 1981 statement. They had known this for some 30 hours before Johnson was called. Under these circumstances, it was error for the trial judge to have allowed the district attorney, first, to cross-examine the State's own witness and, second, to impeach his credibility regarding his direct testimony of what did and did not happen on the evening of December 27, 1980. See Young v. United States, 97 F.2d 200 (5th Cir.1938) (error to admit prior statements where prosecutor knew before placing witnesses on the stand that they would recant).

B.
A technically distinct, though practically linked question arises out of the trial judge's ruling allowing the transcript of the March 2, 1981 statement to be received into evidence. Having concluded that the leading questions asked on cross-examination were improper and that the State did not come within the exception to the rule so as to be entitled to impeach its own witness, the trial court compounded the error by allowing the unsworn out-of-court statement to be used as substantive evidence against Moffett.
It is hornbook law, firmly embedded in the case law of this State, that unsworn prior inconsistent statements may be used for impeachment of the witness' credibility regarding his testimony on direct examination. The prior inconsistent out-of-court statements made by one not a party may not be used as substantive evidence. Ellis & Williams, Mississippi Evidence 46 (1983); Davis v. State, 431 So.2d 468, 473 (Miss. 1983); Magee v. Magee, 320 So.2d 779, 783 (Miss. 1975); Sims v. State, 313 So.2d 388, 391 (Miss. 1975); Hall v. State, 250 Miss. 253, 264, 165 So.2d 345, 350 (1964).
Where the non-party witness admits having made the prior, out-of-court statement, the statement where reduced to written form, should never be introduced into evidence.
If the witness confesses or admits having made prior inconsistent statements, ordinarily there is no necessity for further proof, as by the admission of the prior inconsistent written statement.
Davis v. State, 431 So.2d 468, 473 (Miss. 1983); Sims v. State, 313 So.2d 388, 391 (Miss. 1975); Hammons v. State, 291 So.2d 177, 179 (Miss. 1974); Hall v. State, 250 Miss. 253, 264, 165 So.2d 345, 350 (1964); see Hubbard v. State, 437 So.2d 430, 434 (Miss. 1983) ("obviously for impeachment purposes"); Murphy v. State, 336 So.2d 213, 216-17 (Miss. 1976) (defendant entitled to instruction that prior inconsistent statement may not be used as proof of guilt).
Magee v. Magee, 320 So.2d 779 (Miss. 1975) said of this rule:
[But impeachment] does not mean that the out-of-court statement became evidence on its merits or had any probative value... . The rule seems to be universal *720 that the impeaching testimony does not establish or in any way tend to establish the truth of the matters contained in the out-of-court contradictory statement.
320 So.2d at 783. See also 3 Wigmore, Evidence (3d ed. 1940) § 1018, n. 2.
The reason for this rule is apparent. One of the major premises underlying our rules of evidence is that no evidence may be credited which is not purified via the witnesses' oaths that the evidence is true. These out-of-court statements have not been purified via this authentication process. While fairness dictates that wide latitude necessarily be allowed in cross-examination (assuming, of course, the witness is one the party has the right to cross-examine in the first place), the function of the prior inconsistent statement is to impeach the credibility of the witness' direct testimony. It is to suggest to the fact finder that the direct testimony may not be true because the witness may not be worthy of belief with respect to the matter as to which he has testified.
There is a more practical reason why the statement should not have been given to the jury. The average juror will have a difficult enough time without the statement sitting in his lap keeping distinct in his mind that which he has heard as evidence and what he has been told may be considered for impeachment only. Many suggest it is folly to think juries can  or will even attempt to  keep this distinction in mind. Indeed, here we have a powerful, practical reason undergirding the rule discussed above that a party may not impeach his own witness. McCormick, Evidence § 38, at 75-76 (2d ed. 1972).
What the State was allowed to do in this case was to argue as substantive evidence the factual scenario attributed to Johnson by virtue of the March 2, 1981 interview when no witness at trial has stated on oath that those facts are true and correct. Given the underlying premises of our rules of evidence, such may not be permitted, particularly where the defendant is on trial for his life and where, if anything, the benefit of any reasonable doubt must be given the defendant. Williams v. State, 445 So.2d 798, 814 (Miss. 1984); Gambrell v. State, 92 Miss. 728, 736, 46 So. 138, 139 (1908).
We note that the trial judge correctly instructed the jury that the impeaching statement could not be considered as substantive evidence touching Moffett's guilt or innocence. Instruction No. D-21 provides:
The Court instructs the jury that if a witness recants, under oath, a prior unsworn statement that witnesses credibility may then be impeached by the use of that prior inconsistent unsworn statement. However, that prior inconsistent unsworn statement cannot be considered by the jury as substantive evidence in the case. The prior inconsistent unsworn statement can only be used to show credibility.
We have considered whether this instruction may have cured the error. Upon reflection, this instruction makes us wonder why the prior unsworn statement was ever admitted in the first place, for the trial judge obviously knew what the law was on the point. Considering that the prior unsworn statement was the sole support for a central issue in the case and considering the fact that the prosecuting attorney vigorously argued it as a reason why the jury should find Moffett guilty, the error was not cured.
Without the version of the facts related by Johnson on March 2, 1981, before the court as substantive evidence, the State's case falls apart. The only other evidence the State offered implicating Moffett in the capital murder consists of the single hearsay statement by the witness Kimberly Butler that Moffett told her that "him and a partner tried to rob a gas station and a woman was shot in the process... ." No other evidence even comes close to putting Moffett at the scene of the crime on the evening in question or otherwise implicating Moffett.
The two errors we have found regarding the testimony of the witness Garland Johnson, to-wit: allowing the prosecuting attorney to cross-examine and impeach Johnson *721 and allowing the prior inconsistent out-of-court statement to be received as substantive evidence against Moffett, become crucial. No resort to notions of "death is different" or "heightened scrutiny," see, e.g., Williams v. State, 445 So.2d 798, 810 (Miss. 1983); Laney v. State, 421 So.2d 1216, 1217 (Miss. 1982), is necessary for us to conclude that such errors so infected the proceedings below that Moffett has been denied a fair trial.
The judgment of July 15, 1981, entered by the Circuit Court of Harrison County, adjudging James Vincent Moffett guilty of the crime of capital murder and sentencing him to suffer death in the gas chamber shall be, and it hereby is, reversed and this case is remanded to the docket of the Circuit Court of Harrison County, Mississippi, for a new trial on all issues.
REVERSED AND REMANDED.
DAN M. LEE, PRATHER and SULLIVAN, JJ., concur.
ROY NOBLE LEE, P.J., and HAWKINS, J., specially concur.
BOWLING, J., dissents.
PATTERSON, C.J., and WALKER, P.J., not participating.
ROY NOBLE LEE, Presiding Justice, specially concurring:
The crucial questions in this case are (1) whether the State was taken by surprise, according to the facts and the law, when its witness Garland Johnson, changed his statement implicating Moffett; and (2) whether the trial court erred in admitting Johnson's out-of-court statement, which was used as substantive evidence. The questions have been addressed in a scholarly manner by Justice Robertson in the majority opinion, citing cases decided by this Court over a period of years, clearly holding that the answer to question (1) is no, viz, the State was not taken by surprise, and permitting cross-examination was error, and that the answer to question (2) is yes, viz, the court erred in admitting Johnson's out-of-court statement to be used as substantive evidence. I agree with the majority opinion deciding those questions and join it with this concurring opinion to emphasize the correctness of it.
In addition, I disagree with the reasoning and many of the statements contained in the dissenting opinion. While most of the Bench and Bar recognize that the caseloads of all courts have been greatly increased and the final disposition of cases, particularly criminal, have been slowed and hindered by decisions and rulings of the Federal system, I do not consider this court, or trial courts of this state, to be "on the brink of disaster" because of our caseloads.[1]
The Mississippi law, which decides the principal questions in this case, has been firmly and unhesitatingly applied for more than one hundred years in both criminal and civil cases. We must follow the law or abolish it, or adopt rules of evidence. The law must be followed in this case.

Surprise
Surprise in a courtroom trial means that an attorney, when calling a witness subpoenaed by him, is genuinely taken aback and surprised due to the fact that the witness has, on the witness stand, changed his previous testimony, statement, or evidence given to the attorney, and at a time when the attorney has not shown a lack of diligence in keeping himself apprised with what the witness would testify to. Similarly, where the witness will not cooperate when he has been cooperative, or is sullen or adamant against the questions of the attorney, he is a hostile witness. Under those circumstances, and those alone, may the attorney claim surprise, categorize the witness as hostile, and then cross-examine him. No logical or reasonable grounds for surprise, in my opinion, appear in this case, related to the witness Garland Johnson.
*722 On Friday, July 10, 1981, the defense attorneys for Moffett, having previously interrogated Garland Johnson, as they were required to do in preparing their client's defense, received from Johnson, for the first time, a written statement, wherein he repudiated and denied as true material facts which he related to the State investigating officers in a video-taped statement on March 2, 1981. It is understandable that over the weekend, it would have been difficult to contact and apprise the prosecuting attorneys of that fact. The record is silent thereasto.
The Moffett case was set for trial on the following Monday, July 13, 1981. Prior to the case being called for trial, the record shows that the attorney for Moffett contacted District Attorney Necaise, told him of the statement (tape) and wanted him to listen to it. When the matter was discussed before the trial judge, the district attorney stated to the court:
BY MR. ROSE: * * * *
Now, the reason why I'm I'm apprising the Court of this fact is because when this man takes the stand and he recants that statement, so that Mr. Necaise can't plead surprise on it. That he's given full notice of this statement ____
* * * * * *
BY MR. NECAISE: Judge, uh, that, Mr. Rose can't, uh, Mr. Rose came in my office this morning, uh, shortly before Court time, and wanted me to listen to a tape. And I asked him a tape of what? And he said a tape of Garland Johnson recanting his testimony.
And I asked him was it on video and he said no. And I told him that I was going to stick with the one that I had on video. And I didn't even listen to his. (R. 168-169)
The trial judge also confirmed what the district attorney said in the following colloquy with the defense attorney:
BY THE COURT: (Interposing) No. You advised him in the Courtroom yesterday, after the Jury was picked, as I recall.
BY MR. ROSE: No, Your Honor.
BY MRS. HENDERSON: No, sir.
BY MR. ROSE: Yesterday, at nine o'clock ____
BY THE COURT: (Interposing) That's right. Before we started trial, before we started picking a jury.
BY MR. ROSE: ____ I advised Mr. Necaise that we had a tape recording of this young man ...
BY THE COURT: (Interposing) You're correct. Made last Friday, where he recants. (R. 627-628)
The attorney for Moffett obviously did all he could to get the matter before the district attorney, who was the person interested. As stated above, the district attorney insisted on the trial proceeding, the jury was voir dired and the trial judge declined to hear the defense attorney's position until the district attorney called Johnson to the stand, began to interrogate him, and then claimed surprise. He then said to the Court:
BY MR. NECAISE: At this time, I plead surprise because the Defendant, this Co-Defendant here, Garland Johnson, gave a five page typewritten statement, that is also on video, and I would ask the Court, the Court is observing his demeanor here today and I would ask the Court to, uh, to permit me to, uh, uh, plead surprise and to treat this witness as a hostile witness and attempt to impeach him on his prior inconsistent statement.
Now, I say this to the Court, I am not attempting, if Your Honor please, to impeach him on substantive evidence. But, I am attempting just to impeach him on a prior statement that he gave and I would ask the Court to allow and to let the record also show that the witness is now crying on the witness stand, for the purposes of the record. (R. 625-626)
The trial judge ruled in favor of the district attorney and permitted him to cross-examine the State's witness. (R. 715)
*723 Subsequently, the district attorney offered in evidence the statement obtained by the State from Johnson, which was strenuously objected to by Moffett's attorney on the ground that it could not be used as substantive evidence and was highly prejudicial. The five-page typewritten statement was marked as "State's Exhibit 7" and admitted into evidence.
The district attorney stated further with reference to substantive evidence the following:
BY MR. NECAISE: Judge, for the purposes of, I'm not attempting to use this as substantive law because I think we've already made out a prima facie case with the testimony of Kimberly Butler. You know, I think I can, without his testimony, you know, in other words, without his testimony, I can get to the jury.
In arguing the case to the jury, the district attorney argued the said statement as substantive evidence.
Thus, without question, the district attorney was not surprised by the witness Johnson's change of testimony, and, obviously did not wish to talk with Johnson prior to calling him to the stand in an effort to make out his claim of surprise.[2]
The cases cited and relied upon in the majority opinion mandate that permitting the prosecuting attorney to proceed with cross-examination of Johnson on the claim of surprise and introduction of the State's video-taped and written statement from him, constituted reversible error.

Former Jeopardy
The question of jeopardy is raised and discussed for the first time in the dissent. The district attorney, after declining to hear or see the July 10 statement of Johnson, only claimed surprise. He never mentioned jeopardy. The trial judge permitted cross-examination by the district attorney and introduction of the statement of Johnson to the State, but never thought of, or mentioned, jeopardy. The attorney general's office, in briefing the case and the questions discussed here, never mentioned or relied upon jeopardy.
The district attorney was advised prior to any voir dire or jury selection that the witness Johnson had recanted his statement to the officers, and the defense attorneys moved the court to forbid the prosecutor from pleading surprise. The district attorney could have requested either a continuance, which the court probably would have granted, or a dismissal of the indictment. Such actions would not have barred subsequent trial or re-indictment. See Crist v. Bretz, 437 U.S. 28, 38, 98 S.Ct. 2156, 2162, 57 L.Ed.2d 24, 33 (1977); McNeal v. Hollowell, 481 F.2d 1145, 1149 (5th Cir.1973); Smith v. Mississippi, 478 F.2d 88, 93 (5th Cir.1973); [jeopardy attaches when jury empaneled]; and Jones v. State, 398 So.2d 1312, 1317 (Miss. 1981) [discussing Crist v. Bretz, if charge dismissed before jury empaneled when jeopardy has not attached].
There was no jeopardy at the time the district attorney was informed of the recantation of witness Johnson. However, the State decided to proceed with the case at a time when he knew the status of the witness Johnson and was not surprised that Johnson had changed his statement.

Conclusion
While I recognize that people, judges and justices see questions differently, I am convinced that the majority opinion correctly announces the law applicable to the facts of this case. As a district attorney for twelve years in a five-county district, and as a trial lawyer for many years, the writer has encountered and dealt with, dozens of times, the exact questions now before us. From my examination of cases and records in this Court for almost nine years, I see little difference in people, defendants, and human behavior now from when I began *724 the practice of law. I am confident that so long as judges decide, and attorneys try, cases according to the law, society has nothing to fear.
I concur with the majority opinion.
HAWKINS, Justice, specially concurring:
I concur in reversal.
I do not agree, however, that the circuit judge committed error in permitting the state, under the circumstances in this case, to ask leading questions of Johnson, or to develop the fact that he had made, and the content of, previous contradictory statements.
In deference, I share Justice Bowling's trepidation that the majority is placing an undue restriction on the circuit judge in exercising discretion as to when leading questions will be permitted.[1] Indeed, the majority acknowledges the rule it here follows is subject to criticism.
Except as herein noted, I agree with the majority opinion.
BOWLING, Justice, dissenting:
The news media have seldom discussed dissenting opinions from this Court. This is understandable as it probably is thought that the dissenter is just a "sore toe." I state on my oath that this is not true here. The non-lawyer citizens of this state need to know what I am here saying. It is important for their future and their relations with the Courts.
It is hard for one judge on this Court to have guts enough to write a dissent against all others in opposition to what might seem clear law. Such a judge, when that dissent is distributed among the judges, is subjected to abuse and scurrilous attacks on his ability and intentions.
The people of this state should know in plain and unmistakable terms that the case load of this Court is on the brink of disaster. This carries with it the future of the trial courts. This has been caused to a large extent by our confusing the laws that have to be followed by the trial courts, as we are doing in the case now under consideration. Another cause for the condition of the courts is that they, in the past few years, have been made into "mini" federal courts, which adds to time and expense of trying to carry on a real court's business.
Preliminary proof of what I am saying in connection with this dissent is that when I came on the Court there were a little over 400 cases pending on the merits. Today there are close to 1100. This does not include the barrels of extra matters, such as post-conviction petitions, extraordinary writs, etc. I hasten to say that I am not placing the entire blame on this Court. I am only trying to emphasize that what the majority is causing in the case now under discussion will result in a most harmful situation in the trial courts, insofar as criminal prosecution cases are concerned. Killers do not gather witnesses to verify the killing. Thus, the witnesses to prove a murder are scarce. This brings us directly into a discussion as to what really is held by the majority opinion and what its effect shall be.
As in many criminal cases, whether murder, assault, burglary, robbery, manslaughter or any other crime, there frequently is only one principal witness. We have such a situation here in the person of Garland Johnson. This witness is the half-brother of the person prosecuted for the alleged brutal murder of Helen Allen, while she was working on her job at a self-service gas station.
As set out in the majority opinion, Johnson on March 2, 1981, gave a lengthy, video-taped statement to law enforcement officers. He clearly informed them he was sitting in the car when Moffett went toward the station. Johnson heard a gun fire, and Moffett ran back to the car. Johnson then drove him away to North Gulfport. The statement was much in detail.
*725 Appellant's trial was set for Monday, July 13, 1981. On May 27, 1981, this Court rendered an opinion, through Justice Hawkins, in the case of Jones v. State, 398 So.2d 1312 (Miss. 1981). One of the principal questions in this case was when double jeopardy took effect in a criminal trial when something happened to the prosecution's case. For the benefit of the non-lawyers double jeopardy means that any further prosecution is prohibited. In the Johnson case, the Court through Justice Hawkins, said:
Mandated by decisions of the United States Supreme Court, the rule in this state beginning with this case, is that double jeopardy attaches in any criminal proceeding at the moment the trial jury is selected and sworn to try the case.
On June 30, 1981, the month after the above opinion was published, one of the attorneys for Moffett paid a visit to the principal witness, Johnson. As revealed in the majority opinion, Johnson is alleged to have "recanted" his prior statement to the law enforcement officials during that visit.
A study of the later taped statement given another of the attorneys on July 10, 1981, reveals that in the taped statement, Johnson, in answer to a question about the June 30 interview, stated "and, uh, he just wanted to make a few ... you know, pointers as favors to me about what's happening and what could happen."
The record reveals that, as stated in the majority opinion, Johnson was placed on the stand as the state's witness and when his testimony got to the part about his knowledge of what Moffett did, Johnson remembered none of what he originally had said in his video-taped statement. He stated in front of the court, the jury, attorneys and all others that he was nervous and scared and started to cry. The record shows that members of his family were sitting on the front row immediately in front of him. At one point, the district attorney asked the court to admonish the people in the audience from making gestures toward the witness Johnson.
As revealed by the majority opinion, the trial court saw and heard the video-taped statement of Johnson taken by the law enforcement officers on March 2, 1981, and heard the taped statement taken by Moffett's attorney on July 10, 1981. They both are in the record.
In the taped statement by Moffett's attorney on July 10, Johnson was asked "What are you scared of, Garland? Just tell me what you are scared of." Johnson replied, "If I go on with my original statement." He was then immediately asked, "Now what is your original statement?" Johnson answered, "That we did it."

WHAT DOES THE MAJORITY HOLD AND WHAT IS THE EFFECT OF THAT DECISION?
The majority opinion holds that when the district attorney was asking questions of the witness Johnson, and Johnson started acting peculiar and refused to follow his original statement, that the district attorney could not plead surprise and cross examine Johnson about his inconsistencies. All at a time when Johnson was saying he was scared and was crying.
The majority cites cases on this age-old question of a witness surprising the attorney at the trial by giving testimony different from that theretofore stated. Without a doubt, the trial judge knew of the legal principle involved. He promptly sent the jury from the courtroom and questioned the attorney about the situation. He looked and listened to the video-taped statement of March 2 and listened to the taped statement of July 10. He made comment before his ruling about the clear and convincing type of statement revealed in the video-tape and the uncertainty, hesitation and often not understandable language of the June 30 tape. His opinion was that under the authorities, the state was sufficiently surprised as to what Johnson had thrown into the case to permit the district attorney to inquire of Johnson regarding the March 2 video-taped statement. The majority holds this reversible error. The underlying reason for the majority's holding *726 is the decision by the majority that the state was sufficiently warned about what Johnson's changed testimony would be so that the prosecution could not claim the technical legal issue of "surprise."
We need to go back a little further in discussing this question of surprise. We already have discussed certain questions and answers at the taking of the July 10 taped statement by one of Moffett's attorneys. This as a result of the June 30 interview of Johnson by another Moffett attorney. Also present was a professional criminal investigator. This occurred after the opinion of this Court holding that jeopardy attaches after the jury has been selected.
The only instance shown in this record of any pre-trial notice to any law enforcement personnel of Johnson's change of heart was the district attorney himself stating after the jury was impaneled, sworn and sent to the place of sequestration, that immediately before trial, one of the attorneys mentioned to him that they had a taped conversation showing testimony different from that held by the state. The case was ready for trial. It is significant that Moffett's attorney did not give the court any benefit of this information. He did not file any motion, oral or written, to call this to the court's attention, or to impress it on the prosecuting attorneys. The next mention in the record of any notice to the state was after the jury had been selected following a full day's voir dire examination, empaneled and sworn and sent off to be sequestered for the night. Appellant's attorneys then, for the first time, stated its motion to the court regarding the alleged notice to the state and asked for a ruling from the court that the state could not be surprised by whatever Johnson testified later. This was after 5:30 p.m. on Monday, July 13. Johnson testified at 1:00 p.m. on Tuesday, July 14. This was approximately one-half of that time element recited in the majority opinion. I make no point of this as I think it is immaterial.
The point is that nothing concrete was done and no serious legal, judicial or courtroom procedure was performed by attorneys for Moffett until after the full day's court procedure and the jury selected, empaneled, sworn and sequestered. Above all, after jeopardy had arrived.
It is interesting to note that prior to Johnson's testimony and after the start of the trial, one of Moffett's attorneys stated into the record that he wished to withdraw the motion he had filed to require the state to reveal the identity of informants. Why was that motion dictated before the court? It was well known at that time that there was only one informant and it was Johnson. Could there have been a desire to have taken Johnson from any possible limelight at that stage of the trial?
I do not propose to discuss in detail the many cases of this Court on the narrow issue decisive of the case by the majority, except to point out that there is no "iron clad rule" on that issue. It is a general principle of law. Each case stands on its own footing. Was there in reality surprise? If it was only minimal surprise, was there any prejudice caused thereby? Was the situation so engulfed with uncertainty as to prevent a discretion exercised by the trial judge as was done here? I am forced to quote from the majority opinion and fully adopt that quote as it discusses the legal principle involved. It said: "We recognize today that the rule is not in favor. It has become riddled with exceptions." As stated above, the trial judge found in effect that there really wasn't "surprise" sufficient for appellant to take advantage of it to go Scot free. Even if the double jeopardy question does not come into play, how could the state have any chance of ever getting a conviction [assuming for this argument the guilt of appellant, which I do not now attempt to decide.] The state certainly could not rely on the jury believing Johnson after what has occurred. Moffett has been successful in this endeavor.
This Court long, long ago in the case of Dunlap v. Richardson, 63 Miss. 447, (1886), made it clear that an accused could not take advantage of the technical principle of surprise when it was brought about *727 by fraud or artifice. This principle was further discussed in Rutland v. State, 170 Miss. 650, 155 So. 681 (1934).
We already have discussed what the trial judge heard in the June 30 taped statement when he said, "He just wanted to make a few, you know, pointers as favors to me about what's happening or what could happen." We have already discussed the record disclosure of gestures made by persons in the audience to the witness while he was crying. Of course, Johnson's family was also Moffett's family.
I do not say that fraud was perpetrated in this case. I am trying to point out where under our authorities for many years, the trial court has certain discretion in applying this legal principle of surprise. It is not the prerogative of the defendant accused to handle the matter in such a way that he can holler "no surprise" and the accused walks out of the courtroom.
The trial judge in this case set out in detail the elements which did not automatically give Moffett's attorneys the right to yell "no surprise" and permit Johnson to walk away from the witness stand without the jury having the benefit of this uncertain, unimaginable and suspiciously changed testimony of Johnson. This in my opinion, is one of those cases where the court had a discretion. He was not made a robot by prior opinions of this Court.
The trial judge, after carefully reviewing the video-taped statement of March 2 and listening carefully to the taped statement of July 3, related the clear and convincing impression he received from the video-taped statement as contrary to the contradictory and unbelievable statements of the July 10 taped statement. In using what, in my opinion, was the clear discretion under all the circumstances that existed, the trial judge held that "the district attorney was not apprised of any of it [the July 30 taped statement] he and Mr. Hewes, until the trial started. So I think the proper predicate has been laid for surprise."
I carefully have studied all of the cases cited in the majority opinion and in the briefs filed by both appellant and the state. Nowhere have I found that this Court has attempted to describe the terms "surprise" and "hostility." Some of the cases relied on by appellant do state that in order for a party's witness to be cross examined, his lawyer has to be "surprised" and the witness has to be "hostile." There is certainly no difficulty in describing "hostility" and, to me, there is no difficulty in stating that the witness Garland Johnson was "hostile" to the state as shown by the record. How then can we say that hostility should have been "surprise" to the state. Surprise is harder to define than hostility. The prior cases have emphasized "hostility" rather than "surprise." In Gardner v. State, 368 So.2d 245 (Miss. 1979), [cited in the majority] the Court said:
However, when a witness proves unexpectedly hostile to the party who has called him, he may be cross-examined provided a proper foundation for such is laid.
In Hall v. State, 250 Miss. 253, 165 So.2d 345 (1964), [a case cited by the majority opinion], this Court said:
It should be stated, however, that this Court has held that the State is not bound by the testimony of a witness who unexpectedly proves hostile. Witnesses may be cross-examined or impeached by the party calling them when they prove to be hostile.
I respectfully contend that under the undisputed facts shown in this record, the trial judge did not abuse his discretion when he permitted the state to examine Johnson regarding his original video-taped statement. Johnson at that point was hostile. As indicated by the trial judge, the history of appellant's contention of "no surprise" does not show that anyone, including the trial judge, thought the state's "surprise" was sufficient to prohibit examination of this hostile witness regarding his prior statement.
During all of this discussion, we have to bear in mind that when the court finally was brought into the matter, jeopardy had "set in." Had the trial judge not used *728 what I say was his clear discretion in permitting examination about the video-taped statement, the defendant at that point could have put his hat on and walked out of the courtroom. A directed verdict of acquittal would have been mandated. That is the situation now whether he has the hat or not, he will walk out of the courtroom. This is admitted by the majority opinion where it says, "Without the evidence of the facts related by Johnson on March 2, 1981, before the court as substantial evidence, the state's case falls apart."
In my opinion, the entire matter was handled so that the state's case would fall apart on a legal technicality improperly used. In 81 Am.Jur.2d, Witnesses § 619, p. 629, we find, "Moreover, it has been held that a party may impeach his own witness, not only where he is surprised by his testimony but also where in the judgment of the court, the circumstances appear to require it in the interest of justice."
In its contention that under a "second-prong" of the error, the court should not have permitted the state to introduce the transcription of the March 2 video-taped statement. The opinion stated [with tongue-in-cheek, I hope] that the juror would have a "difficult enough time without the statement sitting in his lap keeping distinct in his mind that which he has heard as evidence and what he has been told may be considered for impeachment only." Only one exhibit was introduced in evidence. There were fourteen jurors, including two alternates. In the event the statement was in one juror's lap, there were thirteen empty laps.
Undisputedly, the trial court gave the jury clear instructions that it was not to consider the reading of the transcription itself as substantial evidence, but could consider all questions and answers during the examination of Johnson about his statement. This included everything that was in the statement. How could a juror intelligent enough to serve on a jury misunderstand such instructions?

WHAT IS THE ULTIMATE RESULT OF THE MAJORITY'S HOLDING?
There are certain elemental rules of human behavior. Not the least of which is that a person accused of a crime does not wish to be confined or executed because of it. There are persons other than the accused who share that opinion. There were certainly such persons admittedly in this case. His defense was an alibi. A number of persons testified on his behalf. The majority opinion opens the way for any accused criminal to go scot-free where there is only one primary witness to convict him in front of a jury. I would hazard a guess, that no witnesses, particularly those surrounded by people such as those in this case, would laugh at a suggestion from anyone talking for the accused, that the witness would look nice at the bottom of a deep hole in the bayou with a concrete block around his neck. Some people are naive enough to believe that such things do not happen. We have a further human situation that in many cases, and certainly where confinement and life are at stake, "money talks." There are many ways that one primary witness may be "gotten to." The opinion in this case paves the roadway to that result in most any case similar to that now before us.
With deference to my learned colleagues, I am convinced that the reason given by the majority for reversing, and in effect releasing, appellant's conviction is erroneous. As hereinbefore stated, I cannot make a robot out of the lower courts and hold that the trial judge in this case did not have the discretion to do as he did. I would affirm.
NOTES
[1] The true picture is to compare the "at issue" cases, which are those cases already submitted for decision, or awaiting argument.
[2] It is inconceivable that any attorney, prosecutor or defense, in an important criminal case, particularly a capital murder case, would not have a brief conference with his witnesses on the day before or the morning before trial.
[1] The conduct of defense counsel in this case, as officers of the court, was not commendable. Johnson was a state witness. The fact he changed his story raises questions.