522 So.2d 201 (1988)
James WILLIAMS, Jr.
v.
STATE of Mississippi.
No. 57423.
Supreme Court of Mississippi.
February 10, 1988.
Rehearing Denied April 13, 1988.
*202 Jim W. Rose, Gulfport, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Donald G. Barlow, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and ANDERSON, JJ.
SULLIVAN, Justice, for the Court:
On September 26, 1984, James Williams, Jr., was convicted of murder and sentenced to life imprisonment by the Circuit Court of Harrison County, Mississippi. He assigns the following as error:
I. & II. Did the "voucher rule", coupled with the rule preventing comment on the State's failure to call a witness, prevent James Williams, Jr. from receiving a fair trial?
III. Should the court have permitted additional testimony concerning James Williams, Jr.'s background?
IV. Should the court have allowed Officer Slote to testify about the statement allegedly given to him by James Williams, Jr.; and
V. Did the court err in not granting James Williams, Jr.'s motion for new trial?
On Monday, July 18, 1983, James Williams, Jr., and his brother Steve were riding around in Gulfport. They stopped "somewhere on 20th Street" and Steve got out of the car and went to talk to some acquaintances. Apparently angered by Steve placing his foot on the back bumper of his pickup truck, Howard Johnson struck Steve and a fight ensued. James Williams, Jr. testified that he broke up the fight and that he and Steve left.
The Williams' brothers went back to the Bayou View Apartments where Steve lived in Building G. After a short stay they left the apartment in separate vehicles in search of beer. They pulled into a Majik Market Store near Railroad Avenue in Gulfport. When they arrived at the Majik *203 Market, Howard Johnson and some of his friends were inside. Minutes later Howard Johnson lay dead in the parking lot of the Majik Market. It is agreed that the fatal shot was fired from a Ruger .22 caliber pistol which James Williams, Jr. was holding.
Shirley Marie Smith, an employee of the Majik Market, called the Gulfport Police. Steve and James Williams were followed to the Bayou View Apartments, where James was seen attempting to hide his gun behind a transformer. Steve and James Williams were promptly arrested.
James Williams, Jr., ultimately admitted having fired the gun but contended that it was during a scuffle with Howard Johnson and that Johnson had grabbed his arm, causing the gun to discharge.
At the trial Shirley Marie Smith testified that at about 1:15 a.m. five or six men came into the Majik Market, and all but two, Howard Johnson and his companion, left shortly thereafter. Johnson and his friend bought some BC powder and a six pack of Miller Beer. As Johnson walked through the front door he was grabbed and pulled outside. According to Smith, Johnson was knocked to the ground and was lying on the sidewalk in front of the store when James Williams, Jr. shot him. Smith stated that James Williams, Jr. was standing over Howard Johnson taking deliberate aim. Smith called the Gulfport Police and while on the phone she heard another shot.
Eula Mae Turner testified that she was also working at the Majik Market on the night in question. Turner's testimony was that Howard Johnson was attacked as he was walking out the door and that he was lying on the ground when he was shot by James Williams, Jr. Turner also testified that there was no one near James Williams, Jr., when he fired the gun.
Reed Lowe, an investigator with the Gulfport Police Department, testified that when he arrived at the Bayou View Apartments he found that James and Steve Williams had already been arrested. Lowe read both suspects their Miranda rights and testified that after he put James Williams, Jr. in the patrol car, Williams told Lowe that some men had jumped his brother and that he (James, Jr.) "did it."
Steve Slote, of the Gulfport Police Department, testified that James Williams, Jr., made an oral statement at the police station. According to Slote, James Williams, Jr., stated that after his brother was attacked outside of the Majik Market, he went to his car and got his gun, he was grabbed by one of his brother's assailants and the gun discharged. Slote testified that James Williams, Jr., stated that the man who attacked him had a broken bottle.
At the close of the State's case in chief, Williams moved to dismiss the charge and this motion was denied.
The defense called eight witnesses who testified that James Williams' reputation for peacefulness was good.
Steve Williams testified about the events of the night in question. According to Steve, there had been a family cookout after which he and James were riding around. At 20th Street Steve instructed James to stop the car and Steve got out and began talking to some people. Steve was accosted by Howard Johnson for putting his foot on the bumper of Johnson's truck. Steve testified that James broke up the fight and that he and James left the scene and went to the apartment.
According to Steve, he and James left the apartment in separate cars to go to the Majik Market to get some beer. After they arrived at the Majik Market, he noticed that the men who had previously attacked him were in the store but he got out of his car anyway and went toward the store to purchase the beer. As he reached the door Steve met Howard Johnson coming out of the Majik Market, and according to Steve, Johnson attacked him again.
Steve stated that he was knocked down and that when James came to break up the fight James was also attacked. Initially, Steve testified that he saw James go to his car, remove his gun, and saw someone grab James' arm as the gun fired. Later, Steve was recalled by defense counsel and he admitted that much of what he had said before had not been true and that he had *204 not been able to closely observe James during the fight.
Dr. E.T. Riemann testified that he examined James Williams, Jr., on July 21, 1983, and found many contusions on his body.
The defendant took the stand and testified in his own defense. His testimony about the earlier fight between Johnson and Steve Williams that he had broken up coincides with the testimony of Steve. James further testified that Steve was attacked outside the Majik Market Store and that he (James) was beaten up when he tried to break up the fight. James claims that he got his gun only to scare the assailants, but his arm was grabbed and the gun accidentally discharged. He further testified that he ran for the front of the store where Steve was being beaten up and fired the gun into the air. Also, he testified that he never mentioned a broken bottle to the police.

I & II.

DID THE VOUCHER RULE, COUPLED WITH THE RULE PREVENTING COMMENT ON THE STATE'S FAILURE TO CALL A WITNESS, PREVENT JAMES WILLIAMS, JR., FROM RECEIVING A FAIR TRIAL?
The only eyewitnesses who testified for the State were Shirley M. Smith and Eula M. Turner, two Majik Market employees. Three men who were in a position to see the shooting were not called to testify, although they were all available at the time of the trial. Leroy Johnson, Howard's brother, was in the Harrison County Jail, having been returned from Parchman for the trial. He was not called as a witness. Neither were Claude Smith and Larry Wells, friends of Howard Johnson's who were at the scene, although they were in the district attorney's office during the trial.
Prior to trial the prosecution filed a motion in limine to prevent defense counsel from commenting on the prosecution's failure to call witnesses who were equally available to the prosecution and the defense. This motion was originally conceded by defense counsel, but this concession was withdrawn, with leave of the trial judge. The trial judge granted, over objection, the prosecution's motion and ordered defense counsel not to comment on the failure of the State to call the witnesses who were equally available to both parties. At trial defense counsel made an offer of proof as to what each of the uncalled witnesses would say, if called. According to defense counsel Claude Smith would have testified that he saw both fights and at the second fight at the Majik Market, James Williams, Jr., went to his car and got a gun and that when he shot Howard Johnson, Johnson was standing up beside Smith and Larry Wells.
Defense counsel further stated that if Larry Wells had been called to testify, he would say he was in the back of a pickup truck in the parking lot of a Majik Market when Steve and James Williams pulled up to the store and that he (Wells) ran inside the store to tell Leroy and Howard Johnson that Steve Williams was back. Wells would say that he had tried to calm Steve Williams but that a fight broke out when Howard Johnson came out of the store. Wells would further testify that James Williams, Jr., pulled a gun from his pocket and shot Howard Johnson and that after Johnson was shot he ran to his truck and tried to crank it, then got out and ran to the west side of the Majik Market where he collapsed.
Finally, according to defense counsel, Leroy Johnson would testify that he saw the fight at the truck and later that evening at the Majik Market and that James Williams, Jr., pulled a gun from his car and shot Howard Johnson and attempted to shoot him (Leroy Johnson).
The district attorney made an offer of proof in which he stated that each of the three witnesses would testify that James Williams, Jr., shot Howard Johnson while Johnson was lying on the ground in front of the Majik Market. All three uncalled witnesses have criminal records.
The trial judge found that the witnesses were equally available to the prosecution and the defendant and therefore granted *205 the State's motion in limine to prevent defense counsel from commenting on the prosecution's failure to call the witnesses. The trial judge stated:
You both agree that the witnesses you're referring to that is proffered are equally accessible. Two of the witnesses, in fact, are within 30 feet of this courtroom right now, and one of them is in the county jail.
.....
James Williams, Jr., now asserts that the voucher rule coupled with the court's ruling which prevented him from commenting on the prosecution's failure to call the three eyewitnesses denied him a fair trial. It must be noted that this case was tried before the new Mississippi Rules of Evidence became effective on January 1, 1986, and the voucher rule was in effect at the time of this trial. We recently addressed the voucher rule in Moffett v. State, 456 So.2d 714 (Miss. 1984), in which we stated:
At common law a party was prohibited from impeaching his own witness. This has been the general rule in Mississippi. Moore v. Chicago, St. Louis & New Orleans R.R. Co., 59 Miss. 243, 248 (1881); Bove v. State, 185 Miss. 547, 554, 188 So. 557, 558 (1938); Manning v. State, 188 Miss. 393, 398, 195 So. 319, 320 (1940). The party calling the witness is said to vouch for his credibility.
Moffett, 456 So.2d at 718.
As we recognized in Moffett the voucher rule has been widely criticized. In Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the United States Supreme Court held that the rigid application of our voucher rule and hearsay rule deprived Chambers of a fair trial. Chambers, 410 U.S. at 302, 93 S.Ct. at 1049, 35 L.Ed.2d at 313. In Chambers, the voucher rule and the hearsay rule worked together to prevent the defendant from presenting evidence that another person had repeatedly confessed to committing the crime that Chambers was charged with. The court determined that in such a case the evidentiary rules must yield to the more important rights of confrontation and fair trial. Chambers, 410 U.S. at 302, 93 S.Ct. at 1049, 35 L.Ed.2d at 313. In Chambers, the defense sought to introduce evidence of a confession made by McDonald, which, if believed, would have exculpated Chambers. Having called McDonald, the defense was not permitted, under the voucher rule, to cross-examine him about his recanted confession. Chambers, 410 U.S. at 294, 93 S.Ct. at 1045, 35 L.Ed.2d at 308. The people to whom this confession was made were not permitted to testify because of Mississippi's hearsay rule. By keeping out this exculpatory evidence, the voucher rule and the hearsay rule worked together to deny Chambers a fair trial.
This case is very different. Even if the testimony of the witnesses mirrored the proffer made by defense counsel and was completely believed by the jury, James Williams, Jr., would not be exculpated. All of the witnesses agree that he shot Howard Johnson.
Second, the voucher rule only prevents a party from cross-examining his own witness. See Moffett v. State, 456 So.2d 714 (Miss. 1984), and cases cited therein. If defense counsel actually believed that the witnesses' testimony would match the proffer that he made, he would not need to resort to cross-examination to establish his theory of the case.
Third, that Chambers limits the application of the voucher rule is widely recognized. See Moffett v. State, supra, and Parker v. State, 514 So.2d 767 (Miss. 1986). If defense counsel had called the three friends of Howard Johnson as witnesses and it had become necessary for him to impeach their testimony, then his remedy would be to present the trial court with an opportunity to suspend the operation of the voucher rule in accordance with the Chambers decision.
As defense counsel knew that these witnesses might testify in support of the prosecution's theory of the case he argued that this would preclude him from claiming "surprise" and impeaching the witnesses. See Moffett v. State, supra. That defense counsel could not claim surprise is wholly irrelevant as the Moffett decision in no way purports to limit Chambers to circumstances *206 in which the defense is surprised by hostile testimony. The Chambers limitation of the voucher rule and the surprise exception to the voucher rule are conceptually and legally distinct. The fact that defense counsel could not claim surprise does not in and of itself prevent him from cross-examining his own witness pursuant to Chambers.
It was not the voucher rule that prevented defense counsel from calling Howard Johnson's friends and brother as witnesses. The record reveals the true reason in the following exchange:
BY THE COURT: ... What prohibits you anyway from calling him, other than the fact, Mr. Rose, that any one of them  You just don't want the bad part of their testimony, I know that.
BY MR. ROSE: Good sense prevents me from calling either one of them. I'm not going to call on these three guys; they're not my friends, or James Williams' friends. They're going to load us down. So, I can't call them.
While the testimony of the three uncalled men might have contradicted that of the two witnesses who worked at the Majik Market, it would not have exculpated James Williams, Jr. Both Chambers and Parker dealt with situations in which the suppressed evidence would, if believed, have exonerated the defendant. Such is not the case here.
On appeal Williams also argues that he should have been permitted to comment on the State's failure to call these three eyewitnesses. Our rule is well established that neither party can comment on the other's failure to call a witness who is equally available to both. To this defense counsel contends that the three uncalled witnesses were not equally available. Williams contends that the voucher rule made the witnesses more available to the prosecution than the defense; and also the fact that the witnesses would be expected to testify favorably to the prosecution makes comment on their failure to testify proper. The prosecution argues that the witnesses were equally available to both parties and that the trial judge was therefore correct in his ruling.
Each of the uncalled witnesses could have been put before the jury by either party. As the trial judge himself stated, "Two of the witnesses, in fact, are within 30 feet of this courtroom right now, and one of them is in the county jail. Both of you have access to them." In granting the motion to prevent defense counsel from commenting on the prosecution's failure to call these witnesses the trial judge relied on Phillips v. State, 183 So.2d 908 (Miss. 1966); Brown v. State, 98 Miss. 786, 54 So. 305 (1910). In Brown v. State, 200 Miss. 881, 27 So.2d 838 (1946), we allowed a prosecutor's comment regarding the defendant's failure to call his brother as a witness. This Court reasoned that the witness was more accessible to the defense and that the prosecution could therefore comment on the defendant's failure to call him. In so holding we stated:
We conclude that while the person of a witness may be accessible to a party, and his physical presence to testify may be procured by process, that is not the whole question; it is also, whether or not the testimony of the witness is equally available to such party. It is one thing for the person of a witness to be available, and his presence at court obtainable, but it is entirely another thing that what he knows can be equally availed of by the other party. We do not think that the testimony of this brother was equally available to the state as to his sister, codefendant with appellant, her husband, in this criminal prosecution.
The Supreme Court of Missouri, discussing this subject, said: "Now the term `available' in the connection in which we are using it does not mean merely available or accessible for the service of a subpoena, since any witness who may be found may be subpoenaed at the instance of either party to any cause. Quite to the contrary the `availability' of a witness to one or the other of the parties to an action depends either upon such party's superior means of knowledge of the existence and identity of the witness, or else upon the relationship of *207 the witness to the party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor of the one party and against the other. In other words, a witness may properly be said to have been peculiarly `available' to one party to an action, so that upon that party's failure to have produced him in court an inference arises that his testimony would have been unfavorable, when such party had so superior an opportunity for knowledge of the witness, or there was such a community of personal interest between the party and the witness, as in ordinary experience would have made it reasonably probable that the witness would have been called to testify for such party except for the fact that it was known or feared that his testimony would be damaging rather than favorable." Huskey v. Metropolitan Life Ins. Co., Mo. App., 94 S.W.2d 1075, 1078 [(1936)].
Brown, 200 Miss. at 889, 890, 27 So.2d at 841. See also, Green v. State, 412 So.2d 758, 760 (Miss. 1982), (following Brown).
In applying the guidelines of Brown v. State, 200 Miss. 881, 27 So.2d 838 (1946), it appears that the uncalled witnesses were more available to the prosecution than to the defense. One of the uncalled witnesses, Leroy Johnson, was the victim's brother, and the other two were friends of the victim. The family relationship and the shared interests of the uncalled witnesses in the prosecution make it "reasonably probable that the witnesses would have been called to testify for [the prosecution] except for the fact that it was known or feared that [their] testimony would be damaging rather than favorable." Brown v. State, 200 Miss. at 890, 27 So.2d at 841 (1946); Green v. State, 412 So.2d at 760.
Practically speaking, the uncalled witnesses were not "peculiarly available" to the prosecution. In Moffett v. State, 456 So.2d 714 (Miss. 1984), we held that if the State had notice that a witness had changed his story, the prosecution could not call the witness and then claim surprise in order to impeach the witness with his prior inconsistent statements. Moffett, 456 So.2d 718, 719. In this case the prosecution had received notice that the witnesses might testify, in some respects, in favor of the defense. Although the prosecution in its proffer contended that this was not so, defense counsel had shut off the avenue of surprise (as in Moffett) and the prosecution could not call the witnesses hoping that they would testify favorably. However, if the prosecution believed that the uncalled witnesses would testify in accordance with their own proffer it is unclear why the State did not call them.
The fact remains that the three uncalled witnesses were equally available to the prosecution and the defendant and the trial judge's ruling which prevented defense counsel from commenting on the prosecution's failure to call the witnesses was correct. Although there are common interests between the uncalled witnesses and the prosecution, as in Brown and Green, the Moffett decision cuts off the prosecution's access to wavering witnesses. The record reflects that defense counsel had the opportunity to talk to these witnesses before the trial and had he chosen to do so, he could have called them as witnesses.
This combined assignment of error is without merit in that the voucher rule did not deprive James Williams, Jr., of a fair trial and the trial judge was not in error in finding that the witnesses were equally available both to the prosecution and the defense.

III.

SHOULD THE COURT HAVE PERMITTED ADDITIONAL TESTIMONY CONCERNING JAMES WILLIAMS, JR.'S BACKGROUND?
James Williams, Jr., was allowed to testify about his marital status, his children, where he grew up, his brothers and sisters, and where he went to high school. He also told the jury about his tour of duty in the Air Force, his honorable discharge, his employment history, his marital difficulties, and his efforts to work his way through college. But when Williams attempted *208 to introduce evidence that he had been given an award for his job performance, the prosecution objected and the objection was sustained. When Williams made an effort to produce evidence that he had his picture in an employee publication an objection was likewise sustained.
Williams now contends that the trial judge unduly restricted evidence of his background. Both the prosecution and Williams agree that our holding in Sanders v. State, 479 So.2d 1097 (Miss. 1985), applies to the case at hand. In Sanders, we stated:
The amount of background information an accused should be permitted to give the jury is discretionary with the trial judge. It is entirely proper to permit an accused to give the jury a brief history of his background or information about himself. It should not be lengthy or detailed, but sufficient to let the jury know something about the man on trial.
Sanders, 479 So.2d at 1104.
With the background information in this record that was already given to the jury we cannot say that the trial judge abused his discretion in refusing to allow Williams to introduce any additional evidence of his job performance. This assignment of error is without merit.

IV.

WAS IT ERROR TO ALLOW OFFICER SLOTE TO TESTIFY ABOUT THE STATEMENT ALLEGEDLY GIVEN TO HIM BY JAMES WILLIAMS, JR.?
The entire basis of this assignment of error is an effort by Williams to have this Court adopt the rule that statements made during custodial interrogation must be tape recorded to be admissible. In support of his assignment Williams relies on Stephan v. State, 711 P.2d 1156 (Alaska 1985), in which the Supreme Court of the State of Alaska held that the Constitution of the State of Alaska imposes such a requirement.
We accept that whether or not a statement is electronically preserved is important in many contexts. If a recording does exist it will often help to demonstrate the voluntariness of the confession, the context in which a particular statement was made, and of course, the actual content of the statement. However, this Court has never held nor does our constitution require that the mere absence of a tape recording renders such statements inadmissible.
Williams conceded that the statement was freely and voluntarily given and that he had been fully advised of his rights. A short statement was made at an early stage in the interrogation; there is no federal or state requirement that custodial interrogations be tape recorded.
The trial judge correctly ruled that the statement was admissible.

V.

WAS IT ERROR TO OVERRULE DEFENSE COUNSEL'S OBJECTION TO IMPROPER ARGUMENT OF THE ASSISTANT DISTRICT ATTORNEY IN SUMMATION?
During closing argument the assistant district attorney made the following remark:
MS ALFONSO: By your vote, you can make the statement clearly, steadfastly, and unequivocally that law or order exists for everyone in Harrison County.
This statement was objected to and the trial court ruled as follows:
MR. ROSE: Judge, I am going to object to that because that is not a fair closing argument to say their vote is a vote for law and order. That is improper.
THE COURT: In the context of which she stated it, I will overrule the objection. You are both given a lot of leeway in closing argument.
Williams contends that the argument improperly influenced the jurors to find him guilty as a matter of community service and as a "testimonial that law and order is alive in Harrison County." Relying on Fulgham v. State, 386 So.2d 1099, 1101 (Miss. 1980), and Ramseur v. State, 368 So.2d 842, 845 (Miss. 1979), Williams argues that the jury's verdict should be based on *209 the evidence and not on "sending a message." The State contends that either the argument was proper or that if it was improper it does not rise to the level of reversible error.
To analyze this assignment of error it is necessary to examine the context in which it arose. In Booker v. State, 511 So.2d 1329, 1331 (Miss. 1987), we discussed the consideration of a similar assignment of error and stated:
In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remark, but must also take into account defense counsel's opening salvo.
Booker, 511 So.2d at 1331.
Here we cannot examine the closing arguments to determine the circumstances surrounding the remark because the transcript was omitted at the request of defense counsel.
We have repeatedly stressed that the necessary transcripts are to be made a part of the record, and that the appellant bears the burden of presenting a record which is sufficient to undergird his assignments of error. Peterson v. State, 518 So.2d 632 (1987); Winters v. State, 473 So.2d 452, 457 (Miss. 1985); Kelly v. State, 463 So.2d 1070, 1073 (Miss. 1985); Dorrough v. State, 437 So.2d 35, 37 (Miss. 1983).
In Carleton v. State, 425 So.2d 1036 (Miss. 1983), a similar argument had been made by the prosecutor, "You know, we have got to let people know what the people of Harrison County stand for." Carleton, 425 So.2d at 1039. There we cautioned that each case must stand on its facts, but we found nothing improper about the statement and held that the trial court properly overruled the appellant's objection to the statement. Carleton, 425 So.2d at 1039. In Ramseur v. State, 368 So.2d 842 (Miss. 1979), we held that trial judge properly sustained an objection to an argument that the jurors were representatives of "the people of the State of Mississippi and this community." Ramseur, 368 So.2d at 844. In Ramseur, we stated that if the remarks were improper, no prejudice resulted since an objection to the argument was sustained. Ramseur, 368 So.2d at 845.
In Fulgham v. State, 386 So.2d 1099 (Miss. 1980), we considered a longer argument in which the jury was depicted as the final link in the chain of law enforcement. Fulgham, 386 So.2d at 1101. Fulgham was reversed on other grounds and we stated, "We do not think that this assignment of error standing alone would require reversal." Fulgham, 386 So.2d at 1101.
Although we cannot properly review this assignment for the reasons already stated and we decline to reverse this conviction on this assignment, we consider the argument improper. The jurors are representatives of the community in one sense, but they are not to vote in a representative capacity. Each juror is to apply the law to the evidence and vote accordingly. The issue which each juror must resolve is not whether or not he or she wishes to "send a message" but whether or not he or she believes that the evidence showed the defendant to be guilty of the crime charged. The jury is an arm of the State but it is not an arm of the prosecution. The State includes both the prosecution and the accused. The function of the jury is to weigh the evidence and determine the facts. When the prosecution wishes to send a message they should employ Western Union. Mississippi jurors are not messenger boys.
While we repeat that Carleton v. State, supra, is still the law of the State of Mississippi, and we will not reverse this conviction on this assignment, we caution prosecutors against making such arguments in the future and we remind defense counsel that if they seek to profit by such improper arguments they must properly preserve their record. This assignment of error is without merit.

VI.

WAS IT ERROR TO REFUSE TO GRANT THE MOTION FOR A NEW TRIAL OF JAMES WILLIAMS, JR.?
In effect this assignment of error is based on Williams' contention that the conviction *210 entered against him doesn't "feel right." As we made abundantly clear in Quinn v. State, 479 So.2d 706 (Miss. 1985), the motion for a new trial following a jury's verdict is a matter for the sound discretion of the trial judge. The Quinn case thoroughly discusses the issue and it is not necessary that we reinvent that wheel here. James Williams, Jr., was found guilty of murder after having received a full and fair hearing during which it was established that he deliberately shot and killed Howard Johnson. Neither the interest of justice nor the weight of the evidence requires that a new trial be ordered in this case. The circuit judge did not abuse his discretion.
The conviction of murder and sentence to life imprisonment are affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P. JJ., and PRATHER, ROBERTSON, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.