479 So.2d 1097 (1985)
Bruce SANDERS
v.
STATE of Mississippi.
No. 54871.
Supreme Court of Mississippi.
November 6, 1985.
*1098 Thomas C. Harvey, Jr., Columbus, for appellant.
Bill Allain, Atty. Gen. by Carolyn Mills, Asst. Atty. Gen., Jackson, for appellee.
En Banc.
HAWKINS, Justice, for the Court:
Bruce Sanders appeals from his conviction in the Circuit Court of Lowndes County for the sale of cocaine, sentence of twelve years and fine of $10,000.
While he makes several assignments of error, we find only one requiring reversal, that the circuit judge erred in granting the state an instruction which authorized it to convict for possession of cocaine with intent to transfer, a crime of the same magnitude and carrying the same sentence as the crime for which he was indicted.

FACTS
Bruce and Bill Sanders are brothers, who lived in Columbus. On the night of Thursday, October 21, 1982, the Mississippi Bureau of Narcotics, in cooperation with the Columbus-Lowndes County Narcotics Unit arranged and secured the illegal sale of cocaine from them.
Tony Owens, a "cooperating individual,"[1] and Ricky Smith, an agent with the Bureau, started out around 8:30 p.m. visiting the local bars searching for the brothers. Not finding either, Owens telephoned their grandmother's residence around 9:30 and Bruce answered. Owens asked for Bill and Bruce replied that he was at the Hilton Inn in Columbus, in Room 109.[2]
Owens and Smith went to the room at the Hilton Inn and Owens asked Bill if he had any cocaine, who replied all he had was *1099 a personal stash at home. Bill called the residence and asked Bruce to get his (Bill's) personal stash from a bedroom and bring it. Bruce complied and appeared a short while later at the motel room. Smith testified as follows:
ANSWER:
All right. Bruce knocked on the door. Bill said come in. He came in. He said hello to everybody, and was half smiling. He took a clear plastic package or envelope out of his left shirt pocket. It had a white powdery substance in it, and he asked who gets it. I, at that time, point to Bill Sanders, and I said give it to him, and Bill said yea, give it to me.
QUESTION:
And, at that time, did he, in fact, give the substance to Bill Sanders?
ANSWER:
At that time he gave the substance to Bill Sanders. Sanders ex  Bill Sanders examined it, and said it looks like you have been tooting out of it already.
QUESTION:
And who did he make that remark to?
ANSWER:
He made that remark to Bruce Sanders.
QUESTION:
At that time, what did Bill Sanders do, Rick?
ANSWER:
At that time, Bill Sanders examined the cocaine, and at that time he ten [sic] handed it to me, and I looked at it, examined it pretty closely, and I asked him how much money he wanted for it. He replied that he wanted $120.00. I tried to talk him down to $110.00, but he wouldn't go. He said he had to have $120.00 for it.
[R.23-24]
Smith paid Bill Sanders $120 for the purchase.
The substance was examined by the Mississippi Crime Laboratory in Batesville and determined to be cocaine. On November 11, 1982, Bruce Sanders was indicted by the Lowndes County grand jury, charging that he did feloniously, knowingly and intentionally sell a controlled substance, towit: cocaine to agent Ricky Smith for $120.
At trial the above facts were related without substantial dispute by Smith, Tom Compton, an officer with the Columbus-Lowndes Narcotics County Unit, and William S. Benyo, Jr., a Bureau agent. The latter two heard the conversation at the motel over a walkie-talkie connected to Smith.
Joe Lee Williams, Jr., an employee of the Mississippi Crime Laboratory, testified to three tests he had made on the substance obtained from Sanders, and gave his opinion that it was cocaine. Douglas Crawford, a chemist with the Mississippi State Chemical Laboratory, also tested the substance and gave his opinion that it was cocaine. Douglas was of the view that some of the tests run by Williams would not be conclusive in determining whether the examined substance was cocaine. The testing by the Mississippi State Chemical Laboratory was made pursuant to a court order sustaining a defense motion for such testing.
Dr. Henry E. Outlaw, a professor of chemistry and biology from Delta State University, testified as a defense witness. Dr. Outlaw made no examination or tests of the substance. It was his opinion that the tests made by the other two experts were inconclusive in determining whether the substance was cocaine.
At the conclusion of the trial, over the objection of Sanders, the state was granted the following instruction:
INSTRUCTION S-5
The Court instructs the Jury that even if you do not find the Defendant guilty of Sale of a controlled substance, you may still find the Defendant guilty of the included offense of Possession of a controlled substance with the intent to transfer. If you find from the evidence in this case beyond a reasonable doubt that the Defendant, BRUCE SANDERS, did on or about October 21, 1982, unlawfully, wilfully, feloniously, knowingly, and intentionally *1100 possess Cocaine with the intent to transfer that Cocaine to another person, then you shall find the Defendant guilty of Possession with intent to transfer.
The first basis of the objection was the proposed instruction was not submitted to defense counsel until the morning of the trial, in violation of Rule 5.03 of the Mississippi Rules of Criminal Procedure. The record also reveals the following comments, objections and ruling of the court in reference to this instruction:
MR. HARVEY:
I would like to say for the record, now your Honor, in answer to the question of whether S-5 is a misstatement of the law. We contend that it is a misstatement of the law and a most dangerous deception and misstatement of the law because it  it, it characterizes the, uh, possession with intent to transfer as a lesser included offense, and it's not lesser. It carries exactly the same penalty as sale itself, and just as the Court has subscribed to the view that the schedule section which defines cocaine, the section relative to sale and possession with intent to transfer and deliver, possession with intent to deliver and so forth defines what sale is and includes those things. So, this is not a lesser included offense, possession with intent to transfer. It would subject  what the jury would be doing if they found possession with intent to transfer, they would be subjecting this defendant to exactly, precisely the same jeopardy of a 30-year maximum sentence as they would if they found him guilty of the sale, and this instruction, we feel, would be calculated to deceive the jury rather than to  rather than to illumine the matter and show them that they could find the man guilty of either sale, with which he is charged, or simply possession.
MR. ALLGOOD:
If your Honor please, if the defense wants to amend that instruction to where it does not say lesser, but the included offense, then the State has no objection. All those offenses are delineated in the same section of the statute, controlled substance statute. That is an included offense to a sale. In order to sell, you have to possess it with the intent to transfer it first. So, consequently, it is an included offense. Of course, in the law we call it a lesser included offense, and I did not intend to mislead the jury. If he wants to strike the word lesser, I have no objection to that.
MR. HARVEY:
In our practice, your Honor, defining offenses that carry the same penalty as being choices that the jury has is unknown. Defining a truly lesser included offense is unknown, and the defense has offered an instruction to that affect [sic].
THE COURT:
Let me see 
MR. ALLGOOD:
Controlled substances statute?
THE COURT:
No, no, I am thinking about murder, and we quite frequently include a manslaughter instruction, which is a lesser included offense.
MR. ALLGOOD:
Yes, sir.
MR. HARVEY:
Carries a different maximum penalty than murder.
THE COURT:
Yes, it's a lesser offense.
MR. HARVEY:
Whereas possession with intent to transfer is not a lesser offense. It is the same offense in that it carries the same maximum penalty.
THE COURT:
Well, would you like the word lesser to be blocked out ot [sic] this instruction?
MR. HARVEY:
No, sir, I would like the instruction not to be given at all because it's, it's going to be hard enough for the jury to distinguish between sale and possession. The man's charged with sale. If we throw in a third element of possession with intent to transfer, the jury is only going to be *1101 confused, and if the jury decides that Bruce Sanders  if they believe Bruce Sanders that he didn't know there was going to be a sale, then they are likely to convict him of possession with intent to transfer which will subject him to the same jeopardy as if he were convicted of what he is charged with.
THE COURT:
Mr. Allgood, do you have any case law upholding this?
MR. ALLGOOD:
If you Honor please, I have no authority for that, and I will be honest with you, I have not researched the law on it. Prior to the enactment of the, uh, present uniform controlled substances law, and the Judge can take this, this may cut both ways. I don't know, you can look at it both ways. I'm just going to tell you the legislative history.
* * * * * *
THE COURT:
I'm going to delete the word lesser. We don't have any law, any case law to guide us, and we'll just make some law. I'm going to give that instruction with lesser deleted.
MR. HARVEY:
Could I ask, your Honor, whether the Court intends to amend that instruction further by letting the jury know that that included offense carries exactly the same penalty as sale?
* * * * * *
THE COURT:
I don't  I was about to say that the jury is not concerned with the penalty in any case that I know of except capital cases.
S-3A I have refused.
MR. HARVEY:
Your Honor, could I ask one more question about S-5. Uh, the statement in the second sentence says in part, "intentionally posses cocaine with intent to transfer that cocaine to another person." Under the law with respect to controlled substances, a transfer cannot take place except from a person who has title to that controlled substance to another who does not. There's no evidence in this record at all that this was Bruce Sanders' controlled substance. Now he possessed it. He possessed whatever it was, and I will assume for the purposes of arugment that it was cocaine. He possessed it, even though it belonged to his brother, but he did not transfer it.
THE COURT:
We are going to write some law. I'm going to give the instruction like it was amended.
[R.266-270]
While the jury was deliberating, they sent a written note to the circuit judge: "Please define the word transfer as used in the Instruction S-5."
There being no objection from counsel, the circuit judge sent the following note to the jury: "There will be no further instructions."
The jury returned a verdict of guilty, and following the judgment of conviction, Sanders appealed.

LAW
Miss. Code Ann. § 41-29-105(s)(4) defines cocaine:
(4) Cocaine, coca leaves and any salt, compound, derivative or preparation of cocaine, coca leaves, and any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions of coca leaves which to do not contain cocaine or ecgonine.
Cocaine is a Schedule II controlled substance under the provisions of Miss. Code Ann. § 41-29-105:
Schedule II of controlled substances.
The controlled substances listed in this section are included in schedule II.
SCHEDULE II
(a) Any of the following substances, except those narcotic drugs listed in other *1102 schedules, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by combination of extranction and chemical systhesis: .. .
* * * * * *
(4) Cocaine coca leaves and any salt compound, derivative, or preparation of cocaine or coca leaves, and any salt, compound, derivative, isomer, or preparation thereof which is chemically equivalent or identical with any of the substances, but not including decocainzed coca leaves or extractions which do not contain cocaine or ecgonine.
Under the provisions of Miss. Code Ann. § 41-29-139, the legislature has sharply differentiated the penalty for mere possession of a controlled substance and its sale or distribution, or possession coupled with intent to sell or distribute.
§ 41-29-139. Prohibited acts A; penalties.
(a) Except as authorized by this article, it is unlawful for any person knowingly or intentionally:
(1) To sell, barter, transfer, manufacture, distribute, dispense or possess with intent to sell, barter, transfer, manufacture, distribute or dispense, a controlled substance; or
* * * * * *
(b) Any person who violates subsection (a) of this section shall be sentenced as follows:
(1) In the case of controlled substances classified in schedule I or II, as set out in sections 41-29-113 and XX-XX-XXX. ... such person may, upon conviction, be imprisoned for not more than thirty (30) years or fined not more than one million dollars ($1,000,000.00) or both;
* * * * * *
(c) It is unlawful for any person knowingly or intentionally to possess any controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his professional practice, or except as otherwise authorized by this article.
Any person who violates this subsection with respect to:
(1) A controlled substance classified in schedule I or II, as set out in sections 41-20-113 and 41-29-115, except marihuana, is guilty of a felony and upon conviction may be imprisoned for not more than three (3) years, or fined not more than thirty thousand dollars ($30,000.00) or both;
[Emphasis added]

VERDICT NOT SUPPORTED BY EVIDENCE
Sanders gives two reasons for this assignment, neither of which we find persuasive. He first argues Bill sold the cocaine and there was no proof of guilty knowledge by Bruce. Bruce admitted on cross-examination he was not unaware his brother fooled with drugs. He delivered the package and stayed there in the motel room for the entire sale. The jury received the conventional instruction that a person who knowingly aids or assists another in the commission of a crime is guilty as a principal. We are unable to say the jury, from all the facts and circumstances of this case, could not find Sanders knowingly aided and assisted his brother in the sale of this cocaine. See: Lee v. State, 244 Miss. 813, 819, 146 So.2d 736, 738 (1962); Johnson v. State, 461 So.2d 1288 (Miss. 1984).
Sanders next argues the state failed to prove this substance was cocaine. The basis of this argument is that Crawford testified he never used two of the tests used by Williams in determining whether or not a substance was cocaine, he would be "wasting time." Nevertheless, both witnesses, undisputed experts, were positive from the tests they made that the substance was cocaine. The weight and credibility of the testimony was for the jury. Likewise, the testimony of Dr. Outlaw, the defense expert offered by the defense, and who never examined the substance, that the tests of Williams and Crawford were inconclusive, only went to *1103 the credibility of the testimony of Williams and Crawford.
Defense counsel had manifestly prior to trial with commendable industry thoroughly schooled himself in the drug cocaine and the tests made to determine whether a substance is cocaine. Unfortunately for his client, however, his cross-examination was no more than an attack on the credibility of the experts.
This Court has neither the time nor inclination in this opinion to edify the reader in the arcane and technical aspects of the drug or the testing for it. Nor do we find any necessity to do so. We cannot second guess the experts, or set ourselves up as superior experts. There is nothing in this record which destroys or so diminishes the credibility or plausibility of the experts as to reject their opinions as not being competent evidence, or say their testimony as to whether or not this substance was cocaine should be rejected as against the overwhelming weight of the evidence.

PREJUDICIAL CLOSING ARGUMENT OF DISTRICT ATTORNEY
In this familiar complaint we also encounter the just as familiar failure of defense counsel to make the appropriate objection and motion.
If an attorney hears opposing counsel make inappropriate statements in closing argument, he has one of two choices, to remain silent or object. Quite frequently counsel deems it wiser to say nothing, surmising that an objection will pointedly direct the jury's attention to a statement they might otherwise pay little, if any heed to. If he fails to object, however, it is singularly poor grace for that same attorney to fault a trial judge on appeal for not stopping an argument to which he made no objection.
Let us suppose counsel decides to object, and makes an objection, which the trial judge sustains. By sustaining the objection the trial judge has told the jury the argument was improper. Counsel then has another option. He can let the matter rest there, or move for a mistrial. There may be a very good reason for not asking for a mistrial after the judge has sustained an objection to the opposing attorney's argument. Counsel might have a good feeling that the jury verdict will be in his favor, so why abort the trial?
Yet, if he chooses not to ask for a mistrial, it is again and singularly poor grace to come to this Court and complain of an error he did not ask the trial judge to correct. This Court can have very little sympathy for such assignments of error before us.
Counsel complains of five statements made by the prosecuting attorney in closing argument. Counsel made objection to three of these statements and the court sustained his objection. He made no objection to the other two statements. He now complains the argument constituted reversible error, and the court erred in not further admonishing the jury to disregard the objectionable argument. In only one instance did he ask the circuit judge to admonish the jury, and the court sustained the request. If counsel wanted more out of the trial judge, he was plainly under a duty to request it. See: Clanton v. State, 279 So.2d 599 (Miss. 1973); Wells v. State, 162 Miss. 617, 139 So. 859 (Miss. 1932).
We have carefully considered all the remarks of which complaint is now made. Some may very well have been proper, but even conceding some were improper, none was of such magnitude that any possible prejudice therefrom was either dissipated by the court sustaining the objection, or would have been dissipated by counsel further requesting the court to admonish the jury. We have repeatedly held that in order for counsel to preserve such trial court errors, he must follow the procedure outlined above. See: Johnson v. State, 477 So.2d 196 [(Miss. 1985) and cases reported therein]; Auman v. State, 271 So.2d 427, 432 (Miss. 1973); Aldridge v. State, 180 Miss. 452, 177 So. 765 (1938).

EXCLUSION OF TESTIMONY BY SANDERS OF HIS PERSONAL BACKGROUND
Upon objection of the state, the circuit judge did not permit Sanders to tell *1104 any more about himself than he lived in Columbus and began college in a Texas junior college.
The amount of background information an accused should be permitted to give the jury is discretionary with the trial judge. It is entirely proper to permit an accused to give the jury a brief history of his background or information about himself. It should not be lengthy or detailed, but sufficient to let the jury know something about the man on trial.
Sanders should have been permitted to tell more about himself than the judge allowed. The boundary of such testimony is for the judge.
Sanders next complains the circuit judge refused to permit him to give his relationship to his brother. The record reveals the following:
QUESTION:
Is he older or younger than you are?
ANSWER:
He's two years older.
QUESTION:
Have you and Bill Sanders had a good relationship?
ANSWER:
Yes, sir. We did growing up.
QUESTION:
Did that continue?
ANSWER:
(Witness sighs) Well, 
MR. ALLGOOD:
If you Honor please, I am going to interpose an objection to this cause once again I don't see how the relationship between him and his brother has any relevancy. The state would object on that ground.
THE COURT:
The Court does not see the relevancy of that question at this point.
QUESTION:
Bruce, did you make any effort to try to improve your relationship with your brother?
MR. ALLGOOD:
If your Honor please, I, I 
THE COURT:
Sustained.
[R.244]
The circuit judge clearly told counsel he saw no relevancy of the question at that point. Neither do we. Counsel's relationship with his brother may have been relevant, but he was under a duty to inform the court why it was relevant, and not remain silent. Having failed to do so, he cannot complain here.
Counsel's brief contains the following scatter shot statement:
... Appellant's defense was that he was acting on his brother's instruction without any knowledge of the nature of the substance or of the proposed sale of cocaine. In excluding this testimony the Court prevented Defendant from fully developing this defense and thereby committed reversible error.
[Abstract and Brief for Appellant, pp. 32-33]
Sanders was not prevented from testifying that he acted without knowledge of the substance of the package he delivered, or that he was acting on his brother's instruction. All of this was covered in his testimony. Counsel unfairly critizes the trial judge in his brief.

STATUTORY DEFINITION OF COCAINE VIOLATES CONSTITUTION
Sanders argues that the overbroad definition of cocaine in the statute renders it void for vagueness. His first basis for this is the opinion of Outlaw during trial that the statute defines two substances, a "D cocaine" which is harmless and "L cocaine" which is a narcotic. As to this contention, if the substance examined by the experts was inert and harmless, counsel should have developed this at the trial level.
His second basis is the contention the statute names a non-existent drug, and to support this contention he simply cites us to a pharmaceutical publication, presumably for this Court to do his work. Counsel was under a duty to present his contention *1105 as to the validity of this statute to the circuit judge. See: Stewart v. City of Pascagoula, 206 So.2d 325 (Miss. 1968); State ex rel. Carr v. Cabana Terrace, 247 Miss. 26, 153 So.2d 257 (1963); Comfort v. Landrum, 52 So.2d 658 (Miss. 1951).
Moreover, as above noted, counsel's brief fails to support such contention.[3]

THE COURT ERRED IN GRANTING INSTRUCTION S-5
The pertinent portions of Rule 5.03 of the Mississippi Rules of Criminal Procedure state:
JURY INSTRUCTIONS
At least twenty-four hours prior to the time that a case is set for trial each of the attorneys shall number and file his jury instructions with the clerk and submit to opposing counsel a numbered copy of the instructions so filed in this case... . Except for good cause shown, the court will not entertain a request for additional instruction or instructions which have not been pre-filed in accordance with the above.
We first observe the court should have excluded the requested instruction as not being timely, and the state gave no good cause for not complying with the rule. Thus far, however, this Court has never reversed a case because the trial judge permitted the state to violate this rule. See: Evans v. State, 457 So.2d 957 (Miss. 1984); Greene v. State, 406 So.2d 805 (Miss. 1981); Henry Gray v. State of Mississippi, 387 So.2d 101 (Miss. 1980); Newell v. State, 308 So.2d 68 (Miss. 1975); and Ferrill v. State, 267 So.2d 813 (Miss. 1972).
Moreover, the instruction should not have been given in any event. Miss. Code Ann. § 99-19-5 provides:
Findings of jury.
On an indictment for any offense the jury may find the defendant guilty of the offense as charged, or of any attempt to commit the same offense, or may find him guilty of an inferior offense, or other offense, the commission of which is necessarily included in the offense with which he is charged in the indictment, whether the same be a felony of misdemeanor, without any additional count in the indictment for that purpose.

[Emphasis added]
The state is, of course, correct in its position that the proper procedure in a case coming under this section is to instruct the jury. See: Crocker v. State, 272 So.2d 664 (Miss. 1973); c.f. Anderson v. State, 290 So.2d 628 (1974). This is not a case in which the instruction was authorized, however.
Noting again pertinent portions of Miss. Code Ann. § 41-29-139:
... it is unlawful for any person knowingly or intentionally:
(1) To sell ... transfer ... or possess with intent to sell, ... transfer ...
It is apparent that under the statute and instruction, "to transfer," as well as to possess with intent to "transfer" cocaine is not an inferior or lesser included offense, but another offense of the same gravity as selling cocaine.
While a literal reading of this statute appears to authorize a jury to convict of another offense of the same gravity "which is necessarily included in the offense with which he is charged in the indictment," all of this Court's cases under this section have dealt with an inferior offense necessarily included within the more serious offense. See: Gillum v. State, 468 So.2d 856, 861 (Miss. 1985); Cannaday v. State, 455 So.2d 713, 725 (Miss. 1984); Biles v. State, 338 So.2d 1004 (Miss. 1976); Gray v. State, 220 Miss. 220, 70 So.2d 524 (1954); Boggan v. State, 176 Miss. 655, 170 So. 282 (1936); Brown v. State, 103 Miss. 664, 60 So. 727 (1913); Bedell v. State, 50 Miss. 492 (1874). We have also held it error to instruct that jury on an offense not necessarily *1106 included in the indictment. See: Wilcher v. State, 455 So.2d 727, 734 (Miss. 1984); Barnes v. State, 249 So.2d 383, 386 (Miss. 1971); Bell v. State, 149 Miss. 745, 115 So. 896 (1928); Scott v. State, 60 Miss. 268 (1882); Moore v. State, 59 Miss. 25 (1881).
In Callahan v. State, 419 So.2d 165 (Miss. 1982), citing this section, we stated:
The law is clear that on indictment for any offense the jury may find the defendant guilty of the offense as charged or any attempt to commit the same offense or may find him guilty of an inferior offense.

We have also held that if the proof in a case shows the crime was completed, the accused may not be convicted of an attempt to commit the offense. See: Williams v. State, 178 Miss. 899, 174 So. 47 (1937); and Holley v. State, 175 Miss. 347, 166 So. 924 (1936).[4]
The language of this statute has not been changed since Hutchinson's Code of 1857. It would appear to be a manifest impossibility that another offense of the same magnitude could ever be "necessarily included in the indictment."
This rationale appears to prevail in all other jurisdictions as well.
Thus, in Sparf v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895), the Supreme Court had occasion to interpret Section 1035 of the Revised Statutes providing that "... in all criminal cases the defendant may be found guilty of any offense the commission of which is necessarily included in that with which he is charged in the indictment ..." The Court held the other offense meant a lesser offense, even though the literal language of the statute does not require the other offense to be lesser.
Section 1035 of the Revised Statutes was codified into 18 U.S.C. § 565. This statute in turn was restated in Rule 31(c) of the Federal Rules of Criminal Procedure. While the language in the body of the Rule does not specifically state a lesser offense, the heading recognizes the intent. Thus, the Rule, with heading, reads:
Rule 31. Verdict
* * * * * *
(c) Conviction of Less Offense. The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense. [Emphasis added]
In Berra v. United States, 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013 (1955), the Supreme Court held as to Rule 31(c):
Rule 31(c) of the Federal Rules of Criminal Procedure provides that a defendant may be found guilty of an offense "necessarily included in the offense charged." In a case where some of the elements of the crime charged themselves constitute a lesser crime, the defendant, if the evidence justified it, would no doubt be entitled to an instruction which would permit a finding of guilt of the lesser offense. [Footnote omitted]
In Berra the defendant was charged with income tax evasion. Two federal statutes were applicable, one a misdemeanor, the other a felony, but the proof required for each was the same. The same facts would authorize conviction under them both. Rejecting the defendant's contention that he was entitled to an instruction authorizing conviction of the misdemeanor, the Court held that since the proof of each offense was the same the defendant was *1107 not entitled to a separate instruction covering only the misdemeanor.
Following Berra, the U.S. Supreme Court in Sansone v. United States, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965) stated:
A lesser included offense instruction is only proper when the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense. [Emphasis added]
11 A.L.R. Fed 173, summarizes the rule as follows, p. 178:
§ 2. Summary
[a] Generally
The principles emerging from the cases demand that two requirements exist concurrent in order for an offense to constitute a necessarily included offense under Rule 31(c) of the Federal Rules of Criminal Procedure. If either of the two requirements is not present, the claimed included offense cannot constitute a necessarily included offense under Rule 31(c).
Firstly, the offense which is claimed to be a lesser, necessarily included offense must indeed be lesser than the charged offense. This requirement can be met only where the included offense involves fewer of the same constituent elements as the charged greater offense, and where the claimed lesser offense has a lighter penalty attached to it than does the charged offense.

And secondly, the two offenses must share common elements. thus, the claimed included offense must have the same elements as, although fewer of those elements than, the charged greater offense. [Emphasis added; footnotes omitted]
42 C.J.S. Indictment and Information, §§ 271-298, under the heading "Conviction of Offenses Included in Charge," deal with innumerable cases throughout the United States under the common law and statutes similar to ours. Invariably the courts require the offense to be "lesser included." See also: Wharton, Criminal Procedure, 12th Ed., Vol. 4, § 545.
As an example of this rationale, in Brown v. State, 206 So.2d 377 (Fla. 1968), the Florida Supreme Court was interpreting the Florida statute requiring an instruction of "any offense which is necessarily included in the offense charged." The court stated, pp. 381-382:
... This simply means that the lesser offense must be an essential aspect of the major offense. In other words, the burden of proof of the major crime cannot be discharged, without proving the lesser crime as an essential link in the chain of evidence. For example, in order to prove a robbery, the state must necessarily prove a larceny as an essential element of the major offense. This is so because every robbery necessarily includes a larceny. Arnold v. State, 83 So.2d 105 (Fla. 1955). It is legally impossible to prove a robbery without also proving a larceny. [Emphasis added]
The state in its brief cites but one case, which is distinguishable from this case, State v. Young, 54 N.C. App. 366, 283 S.E.2d 812 (N.C. 1981). In that case Young was indicted under that state's robbery statute. He was convicted under the state's larceny statute. Both statutes carried the same penalty. Young argued on appeal that larceny was not a lesser included offense because it carried the same penalty. The Court answered this contention as follows, p. 813: "While larceny from the person does carry the same penalty as common law robbery, the North Carolina courts have treated larceny from the person as a lesser included offense."
The North Carolina court simply held that the crime of larceny under its facts was a lesser included offense: whenever robbery was proved larceny would necessarily also be proved, but not the converse. Larceny included some, but not all the essential ingredients of robbery.
In this case we are not dealing with crimes under two separate statutes, one of which has some, but not all of the necessary ingredients of the larger offense. *1108 Rather, we have a single statute in which the Legislature has defined the offenses separately, but carrying the same penalty.
It is also worth noting that a cogent dissent was filed in the North Carolina case, arguing that the same penalty for both offenses should have precluded the granting of the instruction. The dissent concluded as follows:
... I believe the procedure used in this case, whereby the defendant was exposed to conviction for an offense requiring proof of fewer elements without the corresponding benefit of being exposed to a lesser potential penalty if convicted of that offense, is inherently unfair and violates the defendant's due process rights under the Fourteenth Amendment to the Constitution of the United States and under Article I § 19 of the Constitution of North Carolina... .
We are persuaded, aside from the distinction between the two cases, that the dissent follows the rationale of the vast majority of jurisdictions and is better supported by reasoning. For example, in James v. U.S., 16 Alaska 513, 238 F.2d 681 (C.A. 9th Cir.1956), the defendant was charged with burglarizing a dwelling house, when the proof showed the house was unoccupied. It was urged upon the court to sustain a conviction of burglary of a house. It so happened, however, that burglary of a dwelling carried a lesser penalty than burglary of an unoccupied house. The court stated, p. 683: "We are not disposed to hold that the included offense rule is meant to apply where the claimed `lesser' offense prescribes a greater minimum punishment than the so-called `greater' or including offense."
In this case, if the state had desired to prosecute Sanders for possession of cocaine with intent to transfer it to another person, it should have presented the question to the grand jury and secured an indictment specifically charging him with the offense. It is manifestly unfair to indict the defendant for one offense, which he prepares to defend, and then secure an instruction authorizing the jury to convict him of another distinct offense of the same magnitude.
While the authority to convict a lesser included offense began as a weapon of the prosecution, it has become a defense tool as well. Whether applied for the benefit of the state or defense, in order to authorize such instruction the more serious offense must include all the elements of the lesser offense, that is, it is impossible to commit the greater offense without at the same time committing the lesser included offense. Also, there must be some evidence to support the lesser included offense. See: Lee v. State, 469 So.2d 1225 (Miss. 1985); Ruffin v. State, 444 So.2d 839 (Miss. 1984); Lambert v. State, 462 So.2d 308 (Miss. 1984); Colburn v. State, 431 So.2d 1111 (Miss. 1983); and Presley v. State, 321 So.2d 309 (Miss. 1975).
In view of our decision, we need not address the far more difficult question of whether in actual fact it is impossible to be guilty of selling cocaine without at the same time being guilty of possession of cocaine with the intent to transfer. Nor, need we address the equally difficult question, since the instruction was given at the request of the state, did the indictment for sale of cocaine sufficiently inform Sanders he could also be prosecuted for possession with intent to transfer to comply with the 6th Amendment to the United States Constitution and Article 3, Section 6 of the Mississippi Constitution.[5]
*1109 For the reason stated, we reverse and remand for a new trial.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
PRATHER, J., not participating.

APPENDIX A

THE MERCK INDEX

AN ENCYCLOPEDIA OF CHEMICALS AND DRUGS

NINTH EDITION

Martha Windholz, Editor Susan Budavari, Associate Editor Lorraine Y. Stroumtsos, Assistant Editor Margaret Noether Fertig, Assistant Editor

Published by MERCK & CO., INC.

RAHWAY, N.J., U.S.A.

1976
*1110 ic crystals) at 41.5° , and to the monohydrate at 71° . d 25/4 2.03. Sol in water; slightly sol in methanol, ethanol.
USE: Usual source or water-soluble cobalt since it is the most economical and it shows less tendency to deliquesc or dehydrate than the chloride or nitrate. Used in storage batteries; in Co-electroplating baths; as drier for lithographic inks, varnishes; in ceramics, enamels, glazes to prevent discoloring; in Co pigments for decorating porcelain.
2402. Cobaltous Sulfide. CoS; mol wt 91.01. Co 64.76%, S 35.23% Prepn: Glemser in Handbook of Preparative Inorganic Chemistry, vol. 2, G. Brauer, Ed. (Academic Press, New York, 2nd ed., 1965) p 1523.
Exists in two forms. a-CoS: black, amorphous powder. Forms Co(OH)S in air. Sol in HCl. β -CoS: grey powder or reddish-silver octahedral crystals. mp above 1100° ; d 5.45. Practically insol in water; sol in acids.
USE: Catalyst for hydrogenation or hydrodesulfurization.
2403. Cobaltous Thiocyanate. Cobaltous rhodanide; Cobaltous sulfocyanate. C[2]CoN[1]S[2]; mol wt 175.10. C 13.72%, Co 33.66%, N 16.00%, S 36.62%, Co(SCN)[2]. Prepn: Gmelin's, Cobalt (8th ed.) 58 (part A), 380 (1932) and supplement, 720-722 (1961); Schlessinger, Inorganic Laboratory Preparations (Chemical Publishing, New York, 1962) p. 44.
Yellow-brown powder. Soluble in water to give a rose-colored soln; sol in ethanol, methanol, ether, acetone, CHCl[3] to give blue solns.
Trihydrate, violet to violet-brown rhombic crystals; red in transmitted light. Sol in water to give blue soln which becomes pink on dilution; sol in ethanol, ether, acetone to give blue solns.
USE: As humidity indicator.
2404. Cobamamide. Cobinamide, 3-ester with 5, 6-dimethyl-1-a-D-ribofuranosylbenzimidazole, Co-(5-deoxyadenosine-5) deriv., hydroxide, dihydrogen phosphate (ester), inner salt; cobamamidum; coenzyme B[12;] DBC; adenosyl-B[12;] 5-deoxyadenosyl-B[12;] 5-deoxyadenosylcobalamine; dibencozide; dibenzcozamide; dimebenzcozamide; 5,6-dimethylbenzimidazolylcobamide coenzyme; 5,6-dimethylbenzimidazolylcobamide 5-deoxyadenosine; vitamin B[12]

coenzyme; Actimide; Ademide; Anabasi; Betarin; Calomide; Cobalion; Cobaltamin S; Cobanzyme; Cobazymase; Enzicoba; Heraclene; Hi-Fresmin; Indusil; Ripresil; Sabalamin; Xobaline. C[72]H[100]CoN[18]O[17]P; mol wt 1579.57. The coenzyme is the metabolically active form of Vitamin B[12]: Barker et al., Proc. Nat. Acad. Sci. USA 44, 1093 (1958); Weissbach, Taylor, Vitam. Horm. (New York) 26, 395 (1968). Isoln from a culture of Propionibacterium shermanii: Barker et al., J. Biol. Chem. 235, 181, 480 (1960); Biochem. Prepn. 10, 27 (1964). Prepn of aquocobalamin and 2', 3'-O-isopropylidene-5'-O-p-tolylsulfonyladenosine: Hogenkamp, Pailes, ibid. 12, 124 (1968); from treatment of a cobalamin-thiol complex: Murakami et al., U.S., pat. 3,461,114 (1969 to Yamanouchi). The coenzyme differs from Vitamin B[12] by the presence of a 5'-deoxyadenosyl group in the axial ligand occupied by the cyanide in the vitamin. Structure: Lenhert, Hodgkin, Nature 192, 937 (1961). The nucleoside is linked to the cobalt via the 5'-carbon atom of its deoxyribosyl moiety and the biological and chemical reactivity reside in this C to Co bond: Hogenkamp et al., J. Biol. Chem. 240, 3641 (1965) and Fed. Proc. 25, 1623 (1966). Review: Smith, Vitamin B[12] (Methuen & Co., London, 3rd ed., 1965).
Yellow-orange six-faced crystals which become deep red upon exposure to air. Absorption max (H[2]O): 260, 375, 522 nm (A x 10[-6] 34.7, 10.9, 8.0 cm[2]/mole). Soly in water (24°): 16.4 mmol. Solns of pH 3.5, red. Sol in ethanol, phenol; practically insol in acetone, ether, dichloroethylene, dioxane. pKa 3.5. Stability studies: Collado, Nieto, Ann. Pharm. Fr. 27, 427 (1969). Highly sensitive to light, to cyanide and moderately sensitive to acid. Solns are most stable at pH 6-7 stored in the dark. Heating of acid or alkaline solns produces slow inactivation.
THERAP CAT: Hematopoietic vitamin.
2405. Cobrotoxin. The main toxic protein in cobra venom. Crystalization and properties: Yang, J. Biol. Chem. 240, 1616 (1965). Composed of a single peptide chain having 62 amino acid residues intramolecularly cross-linked by four disulfide bonds, Amino acid sequence: Yang et al., Biochem. Biophys. Acta 188, 65 (1969). Complete structure: eidem, ibid. 214, 355 (1970). Review: C.C. Yang, "Biochemical Studies on the Toxic Nature of Snake Venom Cobrotoxin from Formosan Cobra Venom" in Toxins of Animal and Plant Origin I, A. de Vries, E. Kochva, Eds. (Gordon and Breach Science Publishers, New York, 1971) pp 205-236.
2406. Coca. Erythroxylon; cuca; hayo; ipado. Dried leaves of Erythroxylon coca Lam., Erythroxylaceae. Habit. Bolivia, Brazil, Peru, cultivated in Java. Constit. 0.5-1% alkaloids in the South American, 1.5-2.5% in the Javanese leaves. In the former, the major alkaloid is cocaine; in the latter, there is very little cocaine, the alkaloids consisting chiefly of ecgonine derivatives such as benzoyl ecgonine methyl ecgonine, etc. The Java leaves also contain small quantities of tropococaine which is apparently absent in the South American leaves. Other "cocaine" alkaloids present are truxillococaine, isatropylcocaine or cocamine, cocaicine.
Caution: Abuse leads to habituation or addiction.
THERAP CAT: Central stimulant.
2407. Cocaethylene. [1R-(exo, exo)]-3-(Benzoyloxy)-8-methyl-8-azabicyclo[3.2.1]octane-2-carboxylic acid ethyl ester; ecgonine ethyl ester benzoate (ester); O-benzoyl-l-ecgonine ethyl ester; ethylbenzoylecgonine; Homocaine. C[18]H[23]NO[4]; mol wt 317.37. C 68.11%, H 7.31%, N 4.41%, O 20.16%. Homolog of cocaine. Prepn: Merck, Ber. 18, 2952 (1885); Einhorn, ibid. 21, 47 (1888).

Prisms from alcohol, mp 109°. Almost insol in water; sol in alcohol, ether.
THERAP CAT: Local anesthetic.
2408. Cocaine. [1R-(exo, exo)]-3-(Benzoyloxy)-8-methyl-8-azabicyclo[3.2.1]octane-2-carboxylic acid methyl ester; 3β - hydroxy-1a H, 5a H-tropane-2β -carboxylic acid methyl ester benzoate; 2β -carbomethoxy-3β -benzoxytropane; ecgonine methyl-ester *1111 benzoate; l-cocaine; β -cocaine; benzoyl-methylecgonine. C[17]H[21]NO[4]; mol wt 303.35. C 67.31%, H 6.98%, N 4.62%, O 21.10%. From the leaves of Erythraxylon coca Lam. and other species of Erythroxylon, Erythroxylaceae or by synthesis. Extraction procedure: Squibb, Pharm. J. [3] 15, 775, 796; 16, 67 (1885); Emde in Ullmann's Enzyklopadie der Technischen Chemie; Schwyzer, Die Fabrikation pharmazeutischer und chemisch-technischer Produkte (Berlin, 1931). Synthesis: Willstatter et al., Ann. 434, 111 (1923). Configuration: Findlay, J.Am. Chem. Soc. 76, 2855 (1954).

Monoclinic tablets from alcohol, mp 98° . Volatile, esp above 90° , but the sublimate is not crystalline. bp[0.1] 187-188° [α] 18/D -35° (50% alcohol); [α] 20/D - 16° (c = 4 in chloroform). Aqueous solns are alkaline to litmus. pK at 15° = 5.59; K = 2.6 x 10[-6]. Absorption spectrum: Dobbie Fox, J. Chem. Soc. 103, 1194 (1913); Fischer, Arch. Exp. Pathol. Pharmakol. 170, 610 (1933). One gram dissolves in 600 ml water, 270 ml water at 80° , 6.5 ml alcohol, 0.7 ml chloroform, 3.5 ml ether, 12 ml oil turpentine, 12 ml olive oil, 30-50 ml liquid petrolatum; also sol in acetone, ethyl acetate, carbon disulfide. LD[50] i.v. in rats: 17.5 mg/kg.
Caution: Abuse leads to habituation or addiction.
USE: The free base is used for ointments and oily solns because of its soly in fats; otherwise the hydrochloride or the sulfate is preferred.
THERAP CAT: Topical anesthetic (narcotic).
THERAP CAT (VET): See Cocaine Hydrochloride.
2409. Cocaine Hydrochloride. Cocaine muriate. C[17]H[22] ClNO[4]; mol wt 339.81. C 60.08%, H 6.53%, Cl 10.43%, N 4.12%, O 18.83%.
Crystals, granules, or powder; saline, slightly bitter taste; numbs tongue and lips. mp about 195° . [α][D] -72° (c = 2 in aq soln pH 4.5). One gram dissolves in 0.4 ml water; 3.2 ml cold, 2 ml hot alcohol; 12.5 ml chloroform. Also sol in glycerol, acetone. Insol in ether or oils. Avoid heat in preparing soln as it decomposes. Preserve in well-closed, light-resistant containers.
Incompat. Calomel, mercuric oxide, silver nitrate, precipitants of alkaloids in general.
Caution: Abuse leads to habituation or addiction.
THERAP CAT: Topical anesthetic.
THERAP CAT (VET): Local anesthetic and CNS stimulant; now used almost exclusively for local anesthesia of the eye.
2410. Cocaine Nitrate. C[17]H[22]N[2]O[7]; mol wt 366.38. C 55.73%, H 6.05%, N 7.65%, O 30.57%. C[17]H[21]NO[4]HNO[3].
Dihydrate, crystals, mp 58-63° . Freely sol in water or alc; slightly sol in ether. Keep in a cool place.
Caution: Abuse leads to habituation or addiction.
THERAP CAT: Topical anesthetic.
2411. Cocaine Sulfate. C[17]H[23]NO[8]S; mol wt 401.43. C 50.86%, H 5.78%, N 3.49%, O 31.88%, S 7.99%.
White, granular, cryst powder. Sol in water or alcohol.
Caution: Abuse leads to habituation or addiction.
THERAP CAT: Topical anesthetic.
THERAP CAT (VET): See Cocaine Hydrochloride.
2412. Cocarboxylase. 3-[(4-Amino-2-methyl-5-pyrimidinyl)methyl]-5-[2-[[hydroxy (phosphonooxy)phosphinyl]-oxy]ethyl]-4-methylthiazolium chloride; thiamine pyrophosphoric acid ester chloride; thiamine pyrophosphate chloride; thiamine diphosphoric acid ester chloride; thiamine diphosphate ester chloride; Bioxilasi; Bivitasi; Cocarbina; Berolase; Biosyth. C[12]H[19]ClN[4]O[7]P[2]S; mol wt 460.76. C 31.28%, H 4.16%, Cl 7.69%, N 12.16%, O 24.31%, P 13.44%, S 6.96%. The coenzyme or prosthetic group of the yeast enzyme carboxylase which is composed of a protein, apocarboxylase, and cocarboxylase. Cocarboxylase is the key substance in biochemical decarboxylation, it catalyzes the decarboxylation of many α -oxo acids. Enzymatic synthesis: Lohmann, Schuster, Biochem. Z. 294, 183 (1937); Tauber, Enzymologia 2, 171 (1937). Enzymatic synthesis stops when the apoenzyme is satd and is useless for preparative purposes. Chemical synthesis: Weijlard, Tauber, J. Am. Chem. Soc. 60, 2263 (1938); Weil-Malherbe, Biochem. J. 34, 980 (1940); Weijlard, J. Am. Chem. Soc. 63, 1160 (1941); Karrer, Viscontini, Helv. Chim. Acta 29, 711 (1946); Galamon, Filipowicz, C.A. 69, 19108n (1968). Review of enzyme activity: Ullrich et al., Vitam. Horm. (New York) 28, 365 (1970).

Monohydrate, crystals from alc contg some HCl, dec 240-244° . mp 238-240° from abs ethanol. uv max: 242 nm. Soluble in water. pH of 0.3% soln 2.23. The dry substance is very stable. Aq solns are somewhat less stable than solns of thiamine chloride. The free ester forms a stable tetrahydrate, C[12]H[18]N[4]O[7]P[2]S.4H[2]O[2], dec 240-225° . Prepn: Wenz, Gottmann, Koop, U.S. pat. 2,991,284 (1961 to E. Merck).
2413. Cocculus. Fish-berry; Indian berry; Cocculus indicus; oriental berry. Dried fruit of Anamirta cocculus (L.) Wight & Arn., Menispermaceae. Habit. East Indies, Malay Archipelago. Constit. Menispermine, paramenispermine, about 1% picrotoxin, picrotoxic acid, cocculine alkaloid, about 50% fat. Poisonous!
THERAP CAT: Central and respiratory stimulant.
2414. Cochineal. The dried female insect, Coccus cacti L., enclosing the young larvae. Habit. Mexico, Central America; cultivated in West Indies, Canary Islands, Algiers, and Southern Spain. About 70,000 insects to 1 lb. Constit. About 10% carminic acid, about 2% coccerin (a wax), about 10% fat. The coloring matter  alkali carminate  is contained only in the fatty parts of the insect and in the yolk of the eggs, to the extent of 10-14%.
USE: Coloring food products and toilet preparations; the source of carmine and carminic acid for manuf red and pink inks and lakes.
2415. Cocillana. Dried bark of Guarea rusbyi (Britt.) Rusby, Meliaceae. Habit. Bolivia. Constit. Rusbyine, about 2.5% resins, about 2.5% fat, tannin.
THERAP CAT: Expectorant.
THERAP CAT (VET): Has been used as an expectorant.
*1112 2416. Coclaurine. (S)-1,2,3,4-Tetrahydro-1-[(4-hydroxyphenyl)methyl]-6-methoxy-7- isoquinolinol; 1-(p-hydroxybenzyl)-6-methoxy-7-hydroxy- 1,2,3,4-tetrahydroisoquinoline; machiline. C[17]H[19]NO[3]; mol wt 285.33. C 71.56%, H 6.71%, N 4.91%, O 16.82%. Isolated as the racemate from species of Machilus (Lauraceae) and Cocculus (Menispermaceae). First isoln from C laurifolius D.C. believed to be of the d-form: Kondo, Kondo, J. Pharm. Soc. Japan no. 524, 876 (1925), C.A. 20, 604[7] (1926); see also Johns et al., Aust. J. Chem. 20, 1729 (1967). Structure: Kondo, Kondo, J. Pharm. Soc. Japan 48, 1156 (1928); Tomita, Kusuda, ibid. 72, 280 (1952). Synthesis: Kratzl, Billek, Monatsh. 82, 568 (1951); Finkelstein, J. Am. Chem. Soc. 73, 550 (1951). Identity with machiline: Tomita et al., J. Pharm. Soc. Japan 83, 218 (1963), C.A. 59, 2874a (1963). Crystal structure and absolute configuration: Fridrichsons, Mathieson, Tetrahedron 24, 5785 (1968).

NOTES
[1] A cooperating individual is a person who has been caught by narcotics officials violating the controlled substance laws. Thereafter, to save his own hide, he assists the officials in catching other controlled substance law violators.
[2] The record does not reveal why Owens would be telephoning Bill at the grandmother's residence. Nor, if he were searching for both the brothers, when he got Bruce on the phone, why he asked for Bill.
[3] On p. 34 of Sander's brief, his counsel charges "the statute names a non-existent drug. Merck Index, 9th Ed., pp. 314-315." For this Court to understand this citation, we would have to hire a chemist. A copy of these pages is attached as an appendix.
[4] There is, however, a statute which forbids the conviction of an attempt to commit an offense if it shall appear that the crime intended was perpetrated:

Miss. Code Ann § 97-1-9 (1972). Attempt to commit offense  no conviction if offense completed.
A person shall not be convicted of an assault with intent to commit a crime, or of any other attempt to commit an offense, when it shall appear that the crime intended or the offense attempted was perpetrated by such person at the time of such assault or in pursuance of such attempt.
[5] The Sixth Amendment to the U.S. Constitution reads in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation.

Article 3, Section 26 of the Mississippi Constitution reads in pertinent part: "In all criminal prosecutions the accused shall have the right ... to demand the nature and cause of the accusation.
In the recent case of Ward v. State, 479 So.2d 713 (Miss. 1985) On Petition for Rehearing, Justice Prather notes that Rule 2.05 of the Mississippi Uniform Criminal Rules requires an indictment "shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation against him."
See also: Burchfield v. State, 277 So.2d 623 (Miss. 1973); Spears v. State, 253 Miss. 108, 175 So.2d 158 (1965); U.S. v. Debrow, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953); Love v. State, 211 Miss. 606, 52 So.2d 470 (Miss. 1951). For an excellent analysis of the troubling problem of lesser included offenses, see also Barnett, The Lesser-Included Offense Doctrine: A Present Day Analysis for Practitioners, 5 Connecticut Law Review, p. 255.